DAN SIEGEL, SBN 56400
ANNE BUTTERFIELD WEILLS, SBN 139845
EMILYROSE JOHNS, SBN 294319
SIEGEL, YEE & BRUNNER
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698

Attorneys for Plaintiffs
STACY ROJAS, IVETT AYESTAS,
SARAH LARA, and
CLAUDIA "ISAAC" MEDINA

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACY ROJAS, IVETT AYESTAS, SARAH LARA, and CLAUDIA "ISAAC" MEDINA, | Case No. |
| Plaintiffs, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF** |
| vs. | **Demand for Jury Trial** |
| EDMUND G. BROWN, Governor of the State of California; SCOTT KERNAN, Secretary of the California Department of Corrections and Rehabilitation; DERRAL ADAMS, Warden, Central California Women's Facility; DEBORAH K. JOHNSON, Former Acting Warden, Central California Women's Facility; LIEUTENANT TIMOTHY TEGTMEYER, individually and in his official capacity as an officer at Central California Women's Facility; SERGEANT JASON COLLIER, individually and in his official capacity as an officer at Central California Women's Facility; OFFICER [FIRST NAME UNKNOWN] HERRERA, individually and in his official capacity as an officer at Central California Women's Facility; OFFICER [FIRST | |

NAME UNKNOWN] REYNOLDS, )
individually and in his official capacity )
as an officer at Central California )
Women's Facility; OFFICER ISRAEL )
TREVINO, individually and in his )
official capacity as an officer at Central )
California Women's Facility; OFFICER )
ABDEL DALIE, individually and in his )
official capacity as an officer at Central )
California Women's Facility; )
SERGEANT GILBERT RUBALCAVA, )
individually and in his official capacity )
as an officer at Central California )
Women's Facility; OFFICER [FIRST )
NAME UNKNOWN] VALENCIA, )
individually and in his official capacity )
as an officer at Central California )
Women's Facility; OFFICER [FIRST )
NAME UNKNOWN] DEL TORO, )
individually and in his official capacity )
as an officer at Central California )
Women's Facility, )
                                            )
                    Defendants.             )

## INTRODUCTION

1.    Plaintiffs Stacy Rojas, Ivett Ayestas, Sarah Lara, and Isaac Medina[1] were at one time incarcerated at Central California Women's Facility ("CCWF"), a state prison operated by California Department of Corrections and Rehabilitation ("CDCR").  While housed at CCWF on or about November 11, 2015, Plaintiffs Rojas, Ayestas, and Lara were viciously assaulted and tormented without cause or justification, resulting in physical and emotional injury. They were denied medical treatment for their injuries and prevented from filing grievances about the assault they experienced. Similarly, on January 5, 2017, while incarcerated at CCWF, Isaac Medina was viciously assaulted without cause or justification, resulting in physical and emotional injury. He was denied

---

[1] Isaac Medina's legal name is Claudia Medina. This complaint will refer to him by his chosen name and the male pronoun, which is his preferred pronoun.

medical treatment for his injuries.

2.      Plaintiffs are all gender non-conforming and/or queer individuals, and are all survivors of sexual trauma and violence.

## JURISDICTION AND VENUE

3.      Plaintiffs bring claims pursuant to 42 U.S.C. § 1983 and the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

4.      This Court has jurisdiction for claims seeking declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1331, 1343 and the Declaratory Judgment Act, 28 U.S.C §§ 2201, 2202.

5.      Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims brought by plaintiffs and the class have occurred in Madera County in this District.

## PARTIES

**Plaintiffs**

6.      Plaintiff STACY ROJAS is a gender non-conforming former prisoner of California Department of Corrections and Rehabilitation.  While in custody and control of CDCR, plaintiff Rojas was subject to countless instances of verbal harassment by guards at CCWF because of their[2] gender identity. Rojas was brutally attacked by guards on November 11, 2015, for demanding to make a complaint to internal prison investigators concerning verbal harassment from prison guards. Rojas was confined for nearly twelve hours in a small programming cage not meant for punitive confinement and tormented during that time. Rojas was denied medical attention and access to grievances to complain about any of the conduct they suffered.  At all times relevant to this suit, plaintiff Rojas was imprisoned at California Central Women's Facility.

7.      Plaintiff IVETT AYESTAS is a prisoner under the custody and control of

---

[2] Stacy Rojas prefers "they/their" pronouns and will be referred to using "they" or "their" in this complaint.

California Department of Corrections and Rehabilitation. Plaintiff Ayestas is currently imprisoned at California Central Women's Facility, where she is subject to verbal harassment by guards because of her sexual orientation and former sexual victimization. Ayestas was brutally tortured by guards at CCWF on November 11, 2015, after she implied to guards that she would make a complaint against them concerning the use of excessive force she witnessed. Ayestas was confined for nearly twelve hours in a small programming cage not meant for punitive confinement and tormented during that time. Ayestas was denied medical attention, and although permitted to file a grievance, she was never provided information on the outcome of her grievance.

8.      Plaintiff SARAH LARA is a prisoner under the custody and control of California Department of Corrections and Rehabilitation. Plaintiff Lara is currently imprisoned at California Central Women's Facility, where she is subject to verbal harassment by guards because of her sexual orientation and former sexual victimization. Lara was brutally attacked by guards at CCWF on November 11, 2015, for telling guards not to speak to her with derogatory tone or language. Lara was confined for nearly twelve hours in a small programming cage not meant for punitive confinement and tormented during that time. Lara was denied medical attention and access to grievances to complain about any of the conduct she suffered.

9.      Plaintiff ISAAC MEDINA is a transgender prisoner under the custody and control of California Department of Corrections and Rehabilitation. Plaintiff Medina has a disability accommodation requiring the intermittent use of a walker and handcuffing in front of his body or with the use of a waist chain, and as such was known to CDCR and its officers. For all relevant dates, plaintiff Medina was confined at CCWF. While confined at CCWF, he was subject to verbal harassment by guards because of his gender non-conformity. Medina was brutally attacked by guards at CCWF on January 5, 2017 in retaliation for his gender non-conformity. Medina was confined for four hours in a small programming cage not meant for punitive confinement and tormented during that time. Medina was denied medical attention and access to grievances to complain

1  about any of the conduct he suffered.

2  **Defendants**

3    10.    Defendant EDMUND G. BROWN is the Governor of the State of

4  California and oversees all California state agencies, including the CDCR. As governor,

5  defendant Brown is responsible for ensuring that all state agencies comply with state

6  and federal laws, and that the civil and legal rights of individuals subject to such

7  agencies are upheld.  Therefore, he has directly and proximately caused unlawful,

8  unconstitutional, and inhumane treatment of prisoners of CDCR.  Defendant Brown is

9  sued in his official capacity.

10    11.    Defendant SCOTT KERNAN is the Secretary of the California Department

11  of Corrections and Rehabilitation.  As Secretary, defendant Kernan is responsible for

12  ensuring that the CDCR complies with all state and federal laws, and that the civil and

13  legal rights of individuals confined by CDCR are upheld.  In failing to fulfill this

14  responsibility, he has directly and proximately caused unlawful, unconstitutional, and

15  inhumane treatment of prisoners of CDCR. Defendant Kernan is sued in his official

16  capacity.

17    12.    Defendant DERRAL ADAMS is the Warden of Central California

18  Women's Facility.  As such, defendant Adams is responsible for ensuring that CCWF

19  complies with all state and federal laws, and that the civil and legal rights of individuals

20  confined at CCWF are upheld.  In failing to fulfill this responsibility, he has directly and

21  proximately caused unlawful, unconstitutional, and inhumane treatment of prisoners of

22  CCWF. At all times relevant to this suit, he was acting under color of law and within the

23  scope of his employment.  Defendant Adams is sued individually and in his official

24  capacity as Warden of CCWF.

25    13.    Defendant DEBORAH K. JOHNSON is the former Acting Warden of

26  Central California Women's Facility.  While in the position of Acting Warden,

27  defendant Johnson was responsible for ensuring that the CCWF complied with all state

28  and federal laws, and that the civil and legal rights of individuals confined at CCWF

were upheld.  In failing to fulfill this responsibility, she did directly and proximately cause unlawful, unconstitutional, and inhumane treatment of prisoners of CCWF. At all times relevant to this suit, she was acting under color of law and within the scope of his employment.  Defendant Johnson is sued individually and in her official capacity as former Acting Warden of CCWF.

14.    Defendant LIEUTENANT TIMOTHY TEGTMEYER is employed by the CDCR at CCWF and was personally involved in the events described herein. At all times relevant to this suit, he was acting under color of law and within the scope of his employment.  He is sued individually and in his official capacity as an officer for CDCR.

15.    Defendant SERGEANT JASON COLLIER is employed by the CDCR at CCWF and was personally involved in the events described herein. At all times relevant to this suit, he was acting under color of law and within the scope of his employment. He is sued individually and in his official capacity as an officer for CDCR.

16.    Defendant OFFICER [FIRST NAME UNKNOWN] HERRERA is employed by the CDCR at CCWF and was personally involved in the events described herein. At all times relevant to this suit, he was acting under color of law and within the scope of his employment.  He is sued individually and in his official capacity as an officer for CDCR.

17.    Defendant OFFICER [FIRST NAME UNKNOWN] REYNOLDS is employed by the CDCR at CCWF and was personally involved in the events described herein. At all times relevant to this suit, he was acting under color of law and within the scope of his employment.  He is sued individually and in his official capacity as an officer for CDCR.

18.     Defendant OFFICER ISRAEL TREVINO is employed by the CDCR at CCWF and was personally involved in the events described herein. At all times relevant to this suit, he was acting under color of law and within the scope of his employment. He is sued individually and in his official capacity as an officer for CDCR.

19.    Defendant OFFICER ABDEL DALIE is employed by the CDCR at CCWF

and was personally involved in the events described herein. At all times relevant to this suit, he was acting under color of law and within the scope of his employment. He is sued individually and in his official capacity as an officer for CDCR.

20.    Defendant SERGEANT GILBERT RUBALCAVA is employed by the CDCR at CCWF and was personally involved in the events described herein. At all times relevant to this suit, he was acting under color of law and within the scope of his employment. He is sued individually and in his official capacity as an officer for CDCR.

21.    Defendant OFFICER [FIRST NAME UNKNOWN] VALENCIA is employed by the CDCR at CCWF and was personally involved in the events described herein. At all times relevant to this suit, he was acting under color of law and within the scope of his employment.  He is sued individually and in his official capacity as an officer for CDCR.

22.    Defendant OFFICER [FIRST NAME UNKNOWN] DEL TORO is employed by the CDCR at CCWF and was personally involved in the events described herein. At all times relevant to this suit, he was acting under color of law and within the scope of his employment.  He is sued individually and in his official capacity as an officer for CDCR.

## FACTUAL ALLEGATIONS
### November 11, 2015 Incident

23.    On or about November 7, 2015, plaintiff Stacy Rojas was performing programming duties near the guard's desk in Unit 510 at CCWF.

24.    Rojas asked Officer [First Name Unknown] Herrera at the guard's desk to unlock a door so that they could use the bathroom. In response, and without provocation, the guard called Rojas a "stupid hoe."

25.    Rojas was often called such names by guards. Tiring of such treatment, Rojas told Officer Herrera that his and other guards' similar comments had been documented for weeks and that Rojas had evidence of their abuse that they planned to submit to the Investigative Services Unit ("ISU") to substantiate claims of abuse.

26.    Rojas then immediately demanded to speak to the ISU to report the incidents of verbal abuse.  Rojas said that they wanted to turn over the evidence of verbal abuse to ISU.

27.    Despite Rojas's request, the guards either denied or neglected to contact ISU.

28.    On November 11, 2015, at or around 2 p.m., guards in their housing unit instituted a unit and yard recall, which is an alarm that demands that all prisoners return to their assigned housing.  November 11, 2015, was Veterans' Day, a federal holiday, and on holidays, prisoners are allowed to stay in the yard for extended hours.  Therefore, on November 11, prisoners expected not to be recalled from the yard until 3 p.m.

29.    A unit and yard recall is used to conduct a count and dorm check.  Typically in response to a recall, prisoners are expected to return to the doors of their individual cells and wait for the cells to be unlocked by guards after the prisoners are counted.  On this day, the recall was used to force Rojas and their cellmates, which included Ayestas and Lara, to return to their dormitory cell.

30.    Rojas, Ayestas, and Lara complied with the unit and yard recall and returned to their cell, which was unlocked.

31.    Once there, Ayestas asked and received permission from a guard to retrieve her laundry that was in the laundry room, not far from her cell.

32.    After Rojas returned to their cell, guards ordered Rojas, Lara and their roommates out of the cell and had them stand in the day room while they and other unit staff conducted a destructive search of the cell that Rojas, Ayestas, and Lara shared.  Sergeant Jason Collier oversaw the operation and made comments to Rojas and Lara that led them to believe that officers were searching for the evidence of officer misconduct to which that Rojas had alluded several days earlier.

33.     As the nine to 10 Corrections Officers rifled through the belongings of the six residents of the dormitory cell, Rojas again asked Sergeant Collier if they could speak to ISU. Sergeant Collier continued to either deny or neglect plaintiff Rojas' requests.

34.     Although Rojas and their roommates stayed out of the officers' way, Rojas continued to ask to speak to ISU.

35.     In response, Sergeant Collier began shoving Rojas around.

36.     Suddenly and with no warning, Sergeant Collier and other unknown officers violently slammed Rojas to the ground and placed handcuffs on them.

37.     As plaintiff Ayestas exited the laundry room, she was commanded to position herself on the ground face down where she was placed in handcuffs by Officer [First Name Unknown] Reynolds.

38.     Plaintiff Lara began taking contemporaneous notes of the guards' conduct.

39.     With Rojas incapacitated on the ground and in handcuffs, Sergeant Collier perf0rmed what is known as a "boot-burn" on Rojas's back. A "boot-burn" is conducted by stomping forcefully onto a person's back and then dragging one's boot in a grating manner against the skin to create a burning sensation. Sergeant Collier did this for no other reason than to unjustifiably punish and cause pain to Rojas in retaliation for their complaints. As a result of the "boot-burn," Rojas received severe bruising and lacerations on their back.

40.     Guards took Rojas and Ayestas to the Program Office and placed them in isolation cages, which are typically used for brief holding and for programming. The cages do not have a seat and do not provide much room to move.

41.     The Program Office is a standalone building situated between the C-yard and the D-yard.  There is a C-side and a D-side, which are separate but share restroom facilities.

42.     The guards separated Rojas and Ayestas, placing Rojas in the D unit program office and Ayestas in the C unit program office.

43. After Rojas and Ayestas were removed, Lara, still in the Unit, requested a grievance form so that she could lodge a formal complaint. The guard told her that they would not provide access to the grievance form and told her to go sit down.

44. When Lara insisted that she be provided the form, Sergeant Collier responded by yelling at her to "sit the fuck down."

45. Lara was startled by his tone and told him so.

46. In response, and for the sole purpose of inflicting pain, Sergeant Collier grabbed Lara by the wrist. He then ordered Officer Herrera to put handcuffs on Lara. Officer Herrera slammed plaintiff Lara on the ground and applied pressure with his foot or knee to her back. He handcuffed her.

47. While plaintiff Lara lay face down on the ground with Officer Herrera applying pressure on her back, Sergeant Collier approached plaintiff Lara's right side, where the pressure applied by Officer Herrera had caused her right breast to protrude. Sergeant Collier stepped on her exposed breast and applied so much pressure that plaintiff Lara was left with visible bruises. Plaintiff Lara cried out in pain, pleading with them that she was complying and imploring them to stop standing on her back and breast.

48. As Lara still lay flat on her stomach, Sergeant Collier grabbed her by the handcuffed arms and yanked upwards, wrenching her shoulders. She again cried out in pain.

49. Officer Herrera then took Lara to the Program Office.

50. When Lara was taken by Officers Herrera and Allyson Guinn to the Program Office, she was first forced into the inmate restroom for a strip-search. She was un-handcuffed for a brief period so that Officer Guinn could perform the strip-search.

51. Though Officer Guinn primarily performed the strip-search, the search was conducted with the door open and in clear view of Officer Herrera, who was able to observe Lara's nude body.

52.     During the search, the Officer Guinn located and shredded the notes Lara had taken regarding the assault on Rojas.

53.     Lara was menstruating at the time and requested the opportunity to change her tampon. Officer Guinn did not permit this. Instead, she disposed of Lara's clothes and gave her a muumuu to wear. The muumuu was so large that it slipped off her shoulder and exposed her breast intermittently throughout the nearly 12 hours of isolation that followed.

54.     Lara is the victim of severe domestic violence, and she has graphic scarring as a result. The oversized muumuu exposed her scarring as well. Once in the muumuu, Lara was re-handcuffed and put in an isolation cage on the D side of the Program Office.

55.     The isolation cages in the Program Office are designed to allow high-risk prisoners to receive services and therapy in a group setting without being shackled. While they are small, the cages are meant to facilitate group participation and some freedom of movement while doing so.

56.     The isolation cages in the Program Office are backed up to a wall and face the sergeant's office.  People in these cages can only see the office door in front of them, and into the cage to the side of them.

57.     While in the isolation cages of the Program Office, it is not possible to see everything in the hallways or restrooms of the Program Office.  However, it is possible to hear everything.  This includes actions going on in the restrooms and in the opposite side of the Program Office.

58.     Rojas, Lara, and Ayestas were kept in the cramped isolation cages for approximately 12 hours. They were never released for use of the bathroom, medical treatment, or access to food or water. Lara and Ayestas were handcuffed the entire time.

59.     Contrary to policy, Rojas, Lara, and Ayestas were not checked on in the regular intervals required for prisoners in isolation cages.

60.     With no access to a bathroom, Rojas, Lara, and Ayestas were reduced to soiling themselves when they could no longer hold their urine.

61.    During their confinement, corrections officers tormented and taunted Rojas, Lara, and Ayestas.

62.    At or around 11 p.m., Ayestas was taken into the bathroom by a guard. While in the bathroom, she remained in full view of Lieutenant Timothy Tegtmeyer, a male officer. She was ordered to undress and put on a muumuu, which would have caused her to expose herself to Lieutenant Tegtmeyer. When she asked for privacy, Lieutenant Tegtmeyer threatened to put her in Administrative Segregation if she did not undress in front of him.

63.    When Ayestas, the known victim of sexual abuse, insisted that she not be forced to change in view of male officers, Lieutenant Tegtmeyer grabbed her by the shoulders and forced her up against the wall. Sergeant Collier then grabbed her arm and slammed her to the floor. She hit her face on the toilet when she fell. Sergeant Collier placed his knee into plaintiff Ayestas' back and applied his weight, pinning her to the floor.

64.    Lieutenant Tegtmeyer held her legs and Sergeant Collier held her arms. They began removing her clothes.

65.    While plaintiff Ayestas was so pinned, another male officer retrieved a pair of scissors and Lieutenant Tegtmeyer and Sergeant Collier proceeded to cut off Ayestas' clothing.

66.    Ayestas began screaming and crying.

67.    Rojas and Lara overheard the commotion and screaming, and they began begging the officers to stop hurting Ayestas. The guards did not stop.

68.    Traumatized by the commotion and unable to bear the cries of their dear friend, Rojas tied a shoelace around their neck and hanged themselves.

69.    Lara, who could hear Ayestas' screams, and who witnessed Rojas' traumatic response, began banging loudly on her cage and screaming that Rojas was trying to hang themselves.  The officers in the restroom did not respond to her cries for help.

70.    An uninvolved officer, who happened to be passing through the Program Office at the time, was drawn to Lara's screams and responded. The officer opened Rojas' cage, and lifted them up and out of the cage.

71.    At this time, officers performed a search of Rojas, taking their socks and shoes, and placed Rojas in handcuffs. They dressed Rojas in a thin smock and a pair of pants, with no layers, underwear, or bra underneath.

72.    Rather than retrieve medical attention for Rojas, guards placed Rojas back in the holding cell.

73.    After several hours, Guards took Rojas and Lara outside in temperatures below 50 degrees Fahrenheit. Rojas was still wearing the single layer of clothing, wet from having soiled themselves, and no socks or shoes.  Lara was clad only in a muumuu, a pair of socks, and sneakers.

74.    Lara's muumuu kept falling down, exposing her breast. As both Rojas and Lara were handcuffed, Lara's only recourse to cover herself was to ask Rojas to use their teeth to pull up Sara's falling muumuu. Rojas and Lara were shivering from the cold and exposure.

75.    Officers Trevino and Reynolds stood with Rojas and Lara and sexually harassed them. The officers verbally compared the sizes of their genitalia, causing plaintiffs Rojas and Lara to fear further sexual abuse.

76.    After 30 to 60 minutes, Rojas and Lara were returned to the cages. They remained in the isolation cages until 1:30 a.m. or 2 a.m.

77.    At approximately 2 a.m., Rojas and Lara were released to Administrative Segregation staff and taken to the prison's Crisis Center by van. Ayestas was already there. They were finally un-cuffed upon reaching the Crisis Center.

78.    After being processed through the Crisis Center, all three were placed in Administrative Segregation for about 12 hours.

79.     Plaintiffs Rojas, Ayestas, and Lara had visible marks from the officers' abuse over the last nearly 12 hours. Some of their physical injuries remain issues to this day.

80.     Rojas had bruising and serious skin lesions on their neck and on their back from the boot burn. They also experience chronic pain in their wrists.

81.     Rojas' requests for medical attention were ignored.

82.     Lara's wrists were visibly injured, and her right breast was clearly bruised. She suffered other bruising and pain from the force with which she hit the ground. She has lasting pain in her wrists, and her hip regularly locks up, causing her pain.

83.     Ayestas had a black eye from her face hitting the toilet. She had bruises and injury to her back and shoulder from having a knee and the full weight of an officer pressed into her back and having her arm twisted as she was slammed into a wall. She still experiences chronic pain in her back and shoulder from the assault.

84.     They also had severe emotional reactions to the trauma and harassment.

85.     Rojas experiences severe anxiety and panic from the events that transpired.

86.     Lara experiences flashbacks, anxiety, trouble sleeping, and phantom physical sensation mimicking the pain she experienced that day. It triggered memories of sexual violence and abuse.

87.     Lara requested treatment for PTSD but she never received it. Her trauma is ongoing.

88.     Ayestas suffers from flashbacks and night terrors as a result of the incident. She lived in extreme fear after the incident, and her anxiety worsened significantly. She requested treatment for PTSD but was initially denied. She was finally diagnosed with PTSD several months after the incident and receives medication to manage her symptoms.

89.    Despite these visible injuries and the trauma, harassment, and humiliation endured at the hands of corrections officers, plaintiffs received no medical or psychological treatment.

90.    As soon as they arrived in Administrative Segregation, plaintiffs Rojas, Ayestas, and Lara began asking for a CDCR form 602 to file a grievance about their abuse, treatment, and segregation.

91.    They were continually denied access to the grievance forms.

92.    Ultimately, plaintiffs Rojas, Ayestas and Lara filed grievances, but guards constantly lost or discarded the grievances. Only Ayestas' grievance was addressed at the second level of review, which resulted in an investigation, the outcome of which was never shared with Ayestas.

93.    Ayestas submitted a grievance on or around July 11, 2016, to express her dissatisfaction with the investigation and appeal her grievance to the third level. She did not receive a response.

94.    Despite the investigation, the involved guards were never disciplined.

**January 5, 2017 Incident**

95.    Isaac Medina was brutally assaulted by staff at CCWF and denied medical treatment despite visible and severe injuries.

96.    On January 4, 2017, Medina was moved into restricted custody and assigned to Unit 503.

97.    Medina takes medication four times a day, including a transgender hormone treatment and medication to treat seizures, PTSD, and pain from an anti-transgender attack several months earlier at a different institution.

98.    When Medina asked Officer Abdel Dalie to be released from his cell to retrieve his medication the evening he arrived in the Unit, Officer Dalie accused him of lying about his medical needs. He demanded that other prisoners take Medina's identification to the nurse to verify Medina's medical needs. After receiving an

affirmative answer several times, Officer Dalie released Medina to retrieve his medication.

99.    On January 5, 2017, Medina again requested to be let out from his cell to retrieve his medication. Officer Dalie again scrutinized Medina's medication needs.

100.    After opening Medina's cell door, Officer Dalie stood in the doorway and physically intimidated Medina. He told Medina that he knew who Medina was and knew about the anti-transgender attack he suffered.

101.    Medina waited for Dalie to move and left his cell.

102.    Officer Dalie trailed Medina and verbally harassed him.

103.    Medina asked him to stop but he would not.

104.    Medina asked another guard in the Unit to ask Officer Dalie to stop.

105.    Following Medina's request of the other officer, Officer Dalie lunged at him. Without lawful cause to do so, Officer Dalie attempted to grasp Medina and put him in a headlock.

106.    Medina dodged the unwarranted attack, and Officer Dalie could not immediately grab Medina's neck.

107.    During his attempt, Officer Dalie slipped and fell in a pool of water created by a leaking washing machine.

108.    After recovering from his fall, Officer Dalie shut Medina's cell door so that Medina was trapped with him in the Unit.  In 503, there is a catwalk above the unit where an officer armed with a gun, and a sign alerting prisoners that no warning shots will be fired. Without being able to return to his cell, Medina felt like he could not find safety.

109.    Officer Dalie then again attempted to get Medina in a headlock. Medina again dodged his attack, but Officer Dalie gripped Medina and slammed him against the wall.

110.    Many prisoners in the Unit looked on and yelled for Officer Dalie to stop.

111.    Officer Dalie called a code, which alerted other guards to respond to his location.

112.    Sergeant Gilbert Rubalcava and Officers [First Name Unknown] Mendoza, [First Name Unknown] Valencia, and [First Name Unknown] Del Toro responded to the code.

113.    Sergeant Rubalcava approached Medina, put his arm around Medina's neck and held him in a chokehold while Officer Dalie attempted to handcuff Medina and Officers Valencia and Mendoza put Medina in leg shackles.

114.    After placing Medina in leg shackles and placing Medina's right hand in the handcuffs, Officer Dalie began to punch Medina in the side of his abdomen. Officers then performed an unnecessary and violent maneuver on Medina, known as "tossing." With one officer stepping on the chain separating Medina's leg cuffs, another officer shoved Medina from behind, causing him to fall forward. He twisted slightly to avoid falling on his face, and ended up crashing down onto his right side.

115.    Once on the ground, Officer Dalie applied pressure to Medina's back, and Sergeant Rubalcava choked him again. The officers secured Medina's left hand in handcuffs behind his and brought Medina to his feet and pined him again against the wall.

116.    Medina has a known medical requirement that his hands be handcuffed in front of his body or in waist chains. Having his hands handcuffed behind his back caused unnecessary pain. The officers further caused wanton and unnecessary pain by holding Medina's handcuffed arms straight out behind him and lifting up so that his arms were closer to parallel with the ground.

117.    Sergeant Rubalcava then ordered Officer Mendoza, a female guard, to pat down Medina. Medina attempted to position himself in a manner that would allow for the pat down, but Sergeant Rubalcava continuously forced Medina against the wall.

118.    One of the officers stood behind Medina and attempted to kick Medina's legs apart. The kicking caused unnecessary pain because Medina's legs were already spread as far as the leg shackle would permit.

119.    Medina was clad in a ribbed undershirt and sweat pants. When Officer Mendoza patted him down, she loosened the string on his pants. As a result, Medina's pants fell and exposed his gentiles.

120.    The officers walked Medina outside where the ground was slick with rain, and the temperature was approximately 40 degrees. He was escorted in a tank top with his pants down, exposed, both his hands and legs cuffed, and his hands held up in an excruciating manner.

121.    As he was marched outside, Medina was exposed to prisoners and other guards.

122.    Medina pleaded with the guards to raise his pants and allow him to cover himself.  Prisoners watching also yelled to the guards to pick up Medina's pants.

123.    Once outside, Medina was again thrown to the ground.

124.    Officer [First Name Unknown] Del Toro approached Medina with a wheelchair. The officers set Medina in the wheelchair, further exposing his genitals, and kept his hands straight and lifted over the back of the wheelchair. The way that he was placed in the wheelchair caused his feet to drag.

125.     Lieutenant Tegtmeyer, who observed the situation unfold outside, made encouraging remarks to the officers.

126.    The officers pulled Medina from the wheelchair and walked him to the Unit A Program Office. Officers placed him in an isolation cage for four hours with no food, water, or opportunity to use the bathroom.

127.    They kept him in isolation with his hands cuffed behind his back, his legs chained, and his pants pulled down.

128.    At the time of the incident, Medina was disabled. As such, he had several accommodations in accordance with the prison's obligations under the American with

Disability Act. His accommodations included the use of a walker and the prohibition of handcuffing him behind his back.

129.    When putting plaintiff Medina into the isolation cage with his hands cuffed behind his back, Sergeant Rubalcava and Officer Valencia slammed plaintiff Medina's head into the wall, causing his head to bleed.

130.    Medina was left in isolation for four hours and not checked in regular intervals.

131.    When he was checked on, his pleas to go to the bathroom or have water were ignored.

132.    Officers continued to berate and make crude comments to him.

133.    About 30 minutes into his confinement, Lieutenant Tegtmeyer came to his cell and began making sexual comments to Medina. He told other guards, in front of Medina, that Medina had not been with a man in a long time. He suggested that he take Medina to a room around the corner to have sex with him. He said no one would know because Medina was already bloodied up from the attack. Medina grew concerned that he would be sexually assaulted or raped by Lieutenant Tegtmeyer.

134.    After approximately four hours, Medina was released and allowed to go to medical to have an evaluation performed on him. The nurses were visibly distraught at his injuries, but they simply documented them and released him back to the officers so that he could be placed in Administrative Segregation.

135.    Plaintiff Medina had terrible injuries including a dislocated shoulder that was so severe that he could see a bone tenting his skin. He had cuts on his head and ankles and he still suffers from carpel tunnel and nerve damage in his wrists. He loses grip strength intermittently and suffers from chronic pain.

136.    Despite those injuries to his arm, wrist and head, he was denied medical care.

137.    Medina immediately began submitting co-pay slips requesting medical care. All of his requests were ignored.

138.     On January 10, 2017, Medina went on hunger strike to draw attention to his needs.

139.     On or around January 15, 2017, Medina filed a 602 requesting medical care.

140.     Despite his efforts, Medina was not provided medical care until he was moved to California Institute of Women on February 28, 2017.

## EXHAUSTION OF ADMINISTRATIVE RELIEF

141.     All plaintiffs made efforts to exhaust their administrative remedies, but responses by CCWF and CDCR, when provided, have been inadequate.

142.     While plaintiffs Rojas, Ayestas and Lara ultimately filed grievances, the grievances were constantly lost or discarded by guards. Only Ayestas' grievance was addressed at the second level of review, which resulted in an investigation, the outcome of which was never shared with Ayestas, and which appears to have accomplished little.

143.     Upon information and belief, no guards were disciplined regarding the events of November 11, 2015.

144.     Plaintiffs Lara and Ayestas were denied requests for a 602 form to file a grievance against prison staff on November 11 and November 12, 2015.

145.     Plaintiff Ayestas submitted a 602 in December 2015.  After having to appeal to the second level, she heard that her request was partially granted and that CCWF would investigate the incident.

146.     Plaintiff Ayestas, Rojas, and Lara were interviewed as a part of the investigation. However, after some time, it became clear that the prison administration was not going to act as a result of the investigation.

147.     On or around July 11, 2016, Ayestas filed a grievance expressing dissatisfaction with the investigation and asking to appeal her granted second level appeal to the third level. Her grievance was not answered.

148.     Plaintiff Lara filed three separate grievances complaining of her attack and asking for medical care. Her grievances were all lost or unanswered.

149.    On December 2, 2015, Lara filed her first 602 regarding the above-described incidents. She received no response.

150.    In March of 2016, Lara filed a second 602 regarding the incident. This grievance too went unanswered.

151.    On September 15, 2016, Lara filed a third 602. and referenced her previous attempts.  This third 602 was marked "RECEIVED" by CDCR on October 25, 2016.  On October 27, 2016, ten months after first filing a grievance, Lara received a 602 response from CDCR that did not address the substance of her complaint.

152.    Lara has since tried to clarify the response and receive a copy of more paperwork, but she has received no response to these requests.

153.    Medina filed a grievance on January 23, 2107 regarding his assault. He was interviewed and a first level response was issued on March 7, 2017.

154.    Due to Medina's move to CIW, Medina did not receive his first level response. He filed informal requests to receive his response but he was not given his response.

155.    Medina filed a complaint with the Office of Internal Affairs. The office wrote to Medina on March 28, 2017 and told Medina that his issue had been converted into a grievance and sent to the appropriate level of appeal for review. Medina did not see a response to his appeal.

156.    Further efforts to exhaust appeals would be futile and are unnecessary given that the appeals process was constructively unavailable to the plaintiffs due to the prison administration's failure to answer multiple appeals.

**FIRST CLAIM FOR RELIEF**
**USE OF EXCESSIVE FORCE IN VIOLATION OF THE EIGHTH AMENDMENT**
(By all plaintiffs against defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro.)
(42 U.S.C. § 1983)

157.    Plaintiffs incorporate by reference paragraphs 1 through 156 above as though fully set forth herein.

158.    By virtue of the foregoing, defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro, while under color of law, used excessive and unnecessary force and in doing so acted maliciously and sadistically for the purpose of causing harm and not in a good faith effort to maintain or restore discipline, causing harm to plaintiffs, in violation of their right under the Eight Amendment of the United States Constitution to be free from cruel and unusual punishment.

## SECOND CLAIM FOR RELIEF
## DENIAL OF MEDICAL CARE IN VIOLATION OF THE EIGHTH AMENDMENT

(By all plaintiffs against defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro)

(42 U.S.C. § 1983)

159.    Plaintiffs incorporate by reference paragraphs 1 through 158 above as though fully set forth herein.

160.    The Eighth Amendment protection from cruel and unusual punishment places certain duties on prison officials. Such officials must provide humane conditions of confinement; ensure that inmates receive adequate food, clothing, shelter and medical care; and take reasonable measures to guarantee the safety of the inmates.

161.    By virtue of the foregoing, defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro knew of plaintiffs' serious medical needs and the substantial risk of serious harm that was posed, and with deliberate indifference, disregarded the risk of harm to plaintiffs by failing to take reasonable measures to address it, causing harm to plaintiffs, in violation of their right under the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishment.

**THIRD CLAIM FOR RELIEF**
**SEXUAL ABUSE AND HARASSMENT IN VIOLATION OF THE EIGHTH**
**AMENDMENT**
(By all plaintiffs against defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer
Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer
Valencia, Officer Del Toro)
(42 U.S.C. § 1983)

162.     Plaintiffs incorporate by reference paragraphs 1 through 161 above as
though fully set forth herein.

163.     By virtue of the foregoing, defendants Lieutenant Tegtmeyer, Sergeant
Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant
Rubalcava, Officer Valencia, Officer Del Toro sexually abused and harassed plaintiffs,
an act deeply offensive to human dignity and one that serves no legitimate penological
purpose. In doing so, defendants demonstrated malicious and sadistic intent to harm
plaintiffs, causing plaintiffs harm in violation of their Eighth Amendment right to be
free from cruel and unusual punishment.

**FOURTH CLAIM FOR RELIEF**
**RETALIATION IN VIOLATION OF THE FIRST AMENDMENT**
(By all plaintiffs against defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer
Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer
Valencia, Officer Del Toro)
(42 U.S.C. § 1983)

164.     Plaintiffs incorporate by reference paragraphs 1 through 163 above as
though fully set forth herein.

165.     By virtue of the foregoing, defendants Lieutenant Tegtmeyer, Sergeant
Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant
Rubalcava, Officer Valencia, Officer Del Toro motivated by plaintiffs' protected activity,
retaliated against plaintiffs who were engaged in an effort to access the courts, an act
protected under the First Amendment, by assaulting plaintiffs and restricting their
access to grievances, thus chilling the plaintiffs' protected speech.

///

///

///

1

2

**FIFTH CLAIM FOR RELIEF**
**FAILURE TO ADEQUATELY HIRE, TRAIN, SUPERVISE AND DISCIPLINE**
**CORRECTIONS OFFICERS**
(By all plaintiffs against defendants Brown and Kernan in their official capacities)
(42 U.S.C. § 1983)

166.    Plaintiffs incorporate by reference paragraphs 1 through 165 above as though fully set forth herein.

167.    By virtue of the foregoing, defendants failed in their obligation to adequately train their corrections officers to refrain from subjecting prisoners to excessive force and sexual abuse and harassment.

168.    By virtue of the foregoing, defendants were deliberately indifferent to the obvious consequences of their failure to adequately hire, train, supervise, and discipline corrections officers. As a result of these inadequacies, corrections officers employed by the State of California deprived plaintiffs of their rights, as set forth above.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT**
(By plaintiff Medina against defendants Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro and Lieutenant Tegtmeyer)
(42 U.S.C. § 12131 *et seq.*)

169.    Plaintiff incorporates by reference paragraphs 1 through 168 above as though fully set forth herein.

170.    Medina is and at all relevant times was a qualified individual with a disability within the meaning of the Americans with Disabilities Act (ADA).

171.    Defendants Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro and Lieutenant Tegtmeyer knew that Medina was disabled and required disability accommodations including handcuffing in front of his body and a walker.

172.    By virtue of the foregoing, defendants Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro and Lieutenant Tegtmeyer failed to provide Medina with a reasonable accommodation for his disability when providing him the programs,

services, and activities of corrections in violation of the Americans with Disabilities Act.

## XII.  PRAYER FOR RELIEF

173.    Wherefore, plaintiffs pray this Court to order relief as follows:

      a.  Determine that this action is a proper class action, designating plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as class counsel;

      b.  Award injunctive relief in favor of plaintiffs and the other class members from future wrongdoing by the defendants,

      c.  Award compensatory damages in favor of plaintiffs and the other class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      d.  Award plaintiff and the class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

      e.  Such other and further relief as the Court may deem just and proper.

## XIII.  JURY TRIAL DEMANDED

174.    Plaintiffs hereby demand a trial by jury.

Dated: November 9, 2017

        SIEGEL & YEE

        By:  _/s/ EmilyRose Johns_
        EmilyRose Johns

        Attorneys for Plaintiffs
        STACY ROJAS, IVETTE AYESTAS, SARAH LARA, and CLAUDIA "ISAAC" MEDINA