1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **EASTERN DISTRICT OF CALIFORNIA**

10

11 STACY ROJAS, et al.,            )  Case No.: 1:17-cv-01514 - DAD - JLT
                                )

12         Plaintiffs,       )  FINDINGS AND RECOMMENDATIONS
                                )  GRANTING DEFENDANTS' MOTION FOR

13       v.                  )  MISJOINDER AND MOTION TO DISMISS
                                )

14 EDMUND G. BROWN, JR., et al.,  )  (Doc. 30)
                                )

15         Defendants.      )
                                )

16 _____)

17       Stacy Rojas, Ivett Ayestas, Sarah Lara, and Claudia ("Isaac") Medina[1] were incarcerated at

18 Central California Women's Facility.  Plaintiffs contend they each were assaulted by employees of the

19 California Department of Corrections and Rehabilitation while incarcerated at CCWF, and denied

20 medical treatment for their injuries.

21       Defendants Edmund Brown, Scott Kernan, Jason Collier, Gilbert Rubalcava, Israel Trevino,

22 Reynolds, Albert Del Toro, Abdel Dalie, Derral Adams, Officer Valencia, Deborah Johnson, Miguel

23 Herrera, and Janel Espinoza seek misjoinder under Rule 21 of the Federal Rules of Civil Procedure.

24 Defendants assert the claims of Medina should not be joined with the claims of Rojas, Ayestas and

25 Lara.  In addition, Defendants contend the claims presented are subject to dismissal pursuant to Rule

26 12(b)(6) of the Federal Rules of Civil Procedure.  (Doc. 30)  Plaintiffs oppose severance of the claims,

27

28        [1] Isaac Medina's legal name is Claudia Medina.  As Plaintiffs do in the First Amended Complaint, the Court will refer to Medina by his chosen name and the male pronoun.  (*See* Doc. 24 at 2, n.1)

and assert the facts alleged are sufficient to support their claims for relief.  (Doc. 34)

The motion was referred to the assigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.  (Doc. 33)  The Court held a hearing on August 29, 2018.  For the following reasons, the Court recommends Defendants' motion for misjoinder be **GRANTED**, and the motion to dismiss be **GRANTED**.

# I.     Factual Allegations

Plaintiffs assert they "are all gender non-conforming and/or queer individuals, and are all survivors of sexual trauma and violence."  (Doc. 24 at 2, ¶ 2)  Each of the plaintiffs were incarcerated, at some point, at Central California Women's Facility ("CCWF"), where Plaintiffs contend they suffered violations of their constitutional rights.  (*See id.* at 1-2, ¶¶ 1, 7)

## A.     Incidents in 2015

Plaintiffs allege that Stacy Rojas, Ivett Ayestas, and Sarah Lara shared a cell at CCWF in November 2015.  (Doc. 24 at 8, ¶ 36)  According to Plaintiffs, on November 7, 2015, "Rojas was performing programming duties near the guard's desk in Unit 510 at CCWF."  (*Id.* at 7, ¶ 27)  Plaintiffs allege Rojas needed to use the restroom and asked Officer Miguel Herrera to unlock a door, after which Officer Herrara "called Rojas a 'stupid hoe.' (sic)" (*Id.*, ¶ 28)  Plaintiffs allege, "Rojas told Officer Herrara that his and other guards' similar comments had been documented for weeks," and Rojas planned to submit evidence of the abusive comments to the Investigative Services Unit.  (*Id.*, ¶ 29)  Plaintiffs assert Rojas "immediately demanded to speak to the ISU," but "the guards either denied or neglected to contact ISU."  (*Id.*, ¶¶ 30-31)

Plaintiffs assert that on November 11, 2015, a unit and yard was recall was performed around 2 p.m., which directed the prisoners to return to their cells for "a count and dorm check."  (Doc. 24 at 7-8, ¶¶ 32-33)  Plaintiffs assert that "Rojas, Ayestas, and Lara complied with the unit and yard recall and returned to their cell, which was unlocked."  (*Id.* at 8, ¶ 34)  Plaintiffs assert that after returning to the cell, "Ayestas asked and received permission from a guard to retrieve her laundry that was in the laundry room, not far from her cell."  (*Id.*, ¶ 35)  While Ayestas was away, guards ordered Rojas and Lara to exit the cell "and had them stand in the day room while they and other unit staff conducted a destructive search of the cell that Rojas, Ayestas, and Lara shared."  (*Id.*, ¶ 36)  According to Plaintiffs,

Sergeant Jason Collier oversaw the operation—which was conducted by nine to ten correctional officers—and Collier "made comments to Rojas and Lara that led them to believe that officers were searching for the evidence of officer misconduct to which that Rojas had alluded several days earlier." (*Id.*, ¶¶ 36-37)

Plaintiffs report Rojas asked Collier to speak to ISU during the search, and the request was denied. (Doc. 24 at 8, ¶ 37)  Plaintiffs assert that instead, "Sergeant Collier began shoving Rojas around" and Rojas was "violently slammed to the ground" by Collier and other officers, and handcuffed. (*Id.*, ¶¶ 39-40)  Plaintiffs allege, "With Rojas incapacitated on the ground and in handcuffs, Sergeant Collier performed what is known as a 'boot-burn' on Rojas's back," explaining this a "boot burn" is performed "by stomping forcefully onto a person's back and then dragging one's boot in a grating manner against the skin to create a burning sensation." (*Id.* at 9, ¶ 43)  Plaintiffs contend Collier "did this for no reason that to unjustifiably punish and cause pain to Rojas," asserting it was in retaliation for complaints. (*Id.*)  Plaintiffs report that the boot burn caused "severe bruising and lacerations" on Rojas' back. (*Id.*)

Plaintiffs allege: "As plaintiff Ayestas exited the laundry room, she was commanded to position herself on the ground face down where she was placed in handcuffs by Officer Steven Reynolds." (Doc. 24 at 8, ¶ 41) (emphasis omitted)  Plaintiffs assert then "Lara began taking contemporaneous notes of the guards' conduct" during the encounter." (*Id.*, ¶ 42)

According to Plaintiffs, " Guards took Rojas and Ayestas to the Program Office and placed them in isolation cages, which are typically used for brief holding and for programming. The cages do not have a seat and do not provide much room to move." (Doc. 24 at 9, ¶ 44)  Plaintiffs assert Rojas and Ayestas were placed in separate cages. (*Id.*, ¶46)

Plaintiffs assert that "[a]fter Rojas and Ayestas were removed, Lara, still in the Unit, requested a grievance form so that she could lodge a formal complaint. The guard told her that they would not provide access to the grievance form and told her to go sit down." (Doc. 24 at 9, ¶ 47)  According to Plaintiffs, Lara insisted upon receiving a form and "Collier responded by yelling at her to 'sit the fuck down.'" (*Id.*, ¶ 48)  Plaintiffs allege that "Lara was startled by his tone and told him so," and then "Collier grabbed Lara by the wrist," directing Officer Herrera to place her in handcuffs. (*Id.*, ¶¶ 49-50)

Plaintiffs contend Officer Herrera handcuffed Lara after he "slammed … Lara on the ground and applied pressure with his foot or knee to her back." (*Id.*, ¶ 50) Plaintiffs allege:

> While plaintiff Lara lay face down on the ground with Officer Herrera applying pressure on her back, Sergeant Collier approached plaintiff Lara's right side, where the pressure applied by Officer Herrera had caused her right breast to protrude. Sergeant Collier stepped on her exposed breast and applied so much pressure that plaintiff Lara was left with visible bruises. Plaintiff Lara cried out in pain, pleading with them that she was complying and imploring them to stop standing on her back and breast.

(Doc. 24 at 9-10, ¶ 51) Plaintiffs assert that "Sergeant Collier grabbed [Lara] by the handcuffed arms and yanked upwards, wrenching her shoulders," after which Officers Herrera and Allyson Guinn took Lara to the Program Office. (*Id.* at 10, ¶¶ 52-54)

According to Plaintiffs, once Lara arrived at the Program Office, "she was first forced into the inmate restroom for a strip-search," which was performed by Officer Guinn. (Doc. 24 at 10, ¶¶ 54-55) They allege, "the search was conducted with the door open and in clear view of Officer Herrera, who was able to observe Lara's nude body." (*Id.*, ¶ 55) Plaintiffs contend that during the search, "Officer Guinn located . . . the notes Lara had taken during the assault on Rojas," and shredded the notes. (*Id.*, ¶56) In addition, Plaintiffs allege "Lara was menstruating at the time and requested the opportunity to change her tampon," which was not permitted. (*Id.*, ¶ 57) Lara's closed were disposed of, and she received a muumuu to wear. (*Id.*) The plaintiffs assert this "muumuu was so large that it slipped off her shoulder," throughout the time she was in isolation, exposing both Lara's breast and "graphic scarring" from domestic violence that she had suffered. (*Id.* at ¶¶ 57-58)

Plaintiffs assert Royas, Lara, and Ayestas remained in isolation cages for about 12 hours, and "[t]hey were never released for use of the bathroom, medical treatment, or access to food or water." (Doc. 24 at 12, ¶ 62) As a result, "Rojas, Lara, and Ayestas were reduced to soiling themselves when they could no longer hold their urine." (*Id.*, ¶ 64) Plaintiffs allege Ayestas was taken to the bathroom around 11p.m., but "she remained in full view of Lieutenant Timothy Tegtmeyer, a male officer." (*Id.*, ¶ 66) Plaintiffs allege Ayestas "was ordered to undress and put on a muumuu, which would have caused her to expose herself to Lieutenant Tegtmeyer." (*Id.*) According to Plaintiffs, when Ayestas "asked for privacy, Lieutenant Tegtmeyer threatened to put her in Administrative Segregation if she did not undress in front of him." (*Id.*) Ayestas "insisted that she not be forced to change in view of male

officers, Lieutenant Tegtmeyer grabbed her by the shoulders and forced her up against the wall." (*Id.*, ¶ 67) Plaintiffs allege Collier grabbed Ayestas and slammed her to the floor, and Ayestas "hit her face on the toilet when she fell." (*Id.*) Plaintiffs assert that once Ayestas was on the ground, Collier pinned her down with his knee, "Lieutenant Tegtmeyer held her legs and Sergeant Collier held her arms," and the two prison officials "proceeded to cut off Ayestas' clothing." (*Id.* at 11-12, ¶¶ 67-69)

Plaintiffs assert Lara and Rojas could hear the commotion and screaming, and Rojas attempted hanging with a shoelace. (Doc. 24 at 12, ¶ 72) They report Lara witnessed the attempt, and "began banging loudly on her cage and screaming that Rojas was trying to hang…[but] [t]he officers in the restroom did not respond to her cries for help." (*Id.*) Instead, the only response came from an officer "who happened to be passing through the Program Office at the time." (*Id.*, ¶ 74) Rojas' cage was opened, and officers took away Rojas' socks and shoes, dressing "Rojas in a thin smock and a pair of pants, with no layers, underwear, or bra underneath." (*Id.*, ¶ 75) Rojas did not receive medical care, and was returned to the holding cell, handcuffed. (*Id.*, ¶ 76)

According to Plaintiffs, "After several hours, Guards took Rojas and Lara outside in temperatures below 50 degrees Fahrenheit. Rojas was still wearing the single layer of clothing, wet from having soiled themselves, and no socks or shoes. Lara was clad only in a muumuu, a pair of socks, and sneakers." (Doc. 24 at 12, ¶ 77) Both Rojas and Lara were handcuffed, and because Lara's muumuu kept falling, she asked Rojas to pull it up using teeth. (*Id.* at 13, ¶ 78) In addition, Plaintiffs assert: "Officers Trevino and Reynolds stood with Rojas and Lara and sexually harassed them. The officers verbally compared the sizes of their genitalia, causing plaintiffs Rojas and Lara to fear further sexual abuse." (*Id.*, ¶ 79)

Plaintiffs assert that around 2 a.m., Rojas and Lara were released to Administrative Segregation staff and taken to the prison's Crisis Center," where the handcuffs were removed. (Doc. 24 at 13, ¶ 81) Ayestas was already at the Crisis Center, and Plaintiffs report that after all three were processed, they were "placed in Administrative Segregation for about 12 hours." (*Id.*, ¶¶ 81-82)

Plaintiffs allege, "Rojas, Ayestas, and Lara had visible marks from the officers' abuse." (Doc. 24 at 13, ¶ 83) In particular, Plaintiffs assert that "Rojas had bruising and serious skin lesions" from the boot burn, and "requests for medical attention were ignored." (*Id.*, ¶¶ 84-85) Plaintiffs assert that

"Lara's wrists were visibly injured, and her right breast was clearly bruised," and "[s]he suffered other bruising and pain from the force with which she hit the ground." (*Id*., ¶ 86) Lara contends she "has lasting pain in her wrists, and her hip regularly locks up, causing her pain." (*Id*.) Further, Plaintiffs contend: "Ayestas had a black eye from her face hitting the toilet. She had bruises and injury to her back and shoulder from having a knee and the full weight of an officer pressed into her back and having her arm twisted as she was slammed into a wall. She still experiences chronic pain in her back and shoulder from the assault." (*Id.*, ¶ 87) Finally, Plaintiffs contend they each "had severe emotional reactions to the trauma and harassment." (*Id.*, ¶ 88)

Plaintiffs assert that "Rojas, Ayestas, and Lara began asking for a CDCR form 602 to file a grievance about their abuse, treatment, and segregation" once they were placed in Administrative Segregation. (Doc. 24 at 15, ¶ 94) However, the requested forms were repeatedly denied. (*Id.*, ¶ 94) Plaintiffs allege eventually they filed grievances, but they were "constantly lost or discarded" by guards." (*Id.*, ¶96) Ayestas' grievance resulted in an investigation, but she never learned the outcome and "the involved guards were never disciplined." (*Id.*, ¶¶ 96, 98)

### B.    Incidents in 2017

Isaac Medina, "a transgender prisoner under the custody and control of California Department of Corrections and Rehabilitation," was incarcerated at CCWF in January 2017. (*See* Doc. 24, ¶¶ 13, 99) Plaintiffs report he "takes medication four times a day, including a transgender hormone treatment and medication to treat seizures, PTSD, pain from an antitransgender attack several months earlier at a different institution." (*Id.* at 15, ¶ 101) In addition, Plaintiffs assert that at the time, Medina was disabled and "[h]is accommodations included the use of a walker, and the prohibition of handcuffing him behind his back." (*Id.* at 18, ¶ 132)

"On January 4, 2017, Medina was moved into restricted custody and assigned to Unit 503." (Doc. 24 at 15, ¶ 101) Plaintiffs assert that the evening Medina arrived at Unit 503, he requested to be released from the cell by Officer Dalie "to retrieve his medication." (*Id.*, ¶ 102) According to Plaintiffs, "Officer Dalie accused [Medina] of lying about his medical needs," and had "other prisoners take Medina's identification to the nurse to verify Medina's medical needs." (*Id.*) Once Officer Dalie received an affirmative answer, he released Medina to retrieve the medication. (*Id.*)

Plaintiffs assert that the next day, "Officer Dalie again scrutinized Medina's medication needs." (Doc. 24 at 15, ¶ 103) Plaintiffs allege: "After opening Medina's cell door, Officer Dalie stood in the doorway and physically intimidated Medina. He told Medina that he knew who Medina was and knew about the anti-transgender attack he suffered." (*Id.*, ¶ 104) They assert "Medina waited for Dalie to move," and once he did so, Medina left the cell. (*Id.*, ¶ 105) However, "Officer Dalie trailed Medina and verbally harassed him." (*Id.*, ¶ 106) Plaintiffs assert Medina asked Dalie to stop and then "asked another guard in the Unit to ask Officer Dalie to stop." (*Id.*, ¶ 108)

According to Plaintiffs, "Following Medina's request of the other officer, Officer Dalie lunged at him," and "attempted to grasp Medina and put him in a headlock." (Doc. 24 at 15, ¶ 109) Plaintiffs assert Medina dodged the grasp, and "Officer Dalie slipped and fell in a pool of water created by a leaking washing machine." (*Id.* at 15-16, ¶¶ 110-111) Plaintiffs allege Dalie then "shut Medina's cell door so that Medina was trapped with him in the Unit," and "again attempted to get Medina in a headlock." (*Id.* at 16, ¶¶ 112-113) Although Medina dodged the headlock, he reports "Officer Dalie gripped [him] and slammed him against the wall." (*Id.*, ¶ 113) Plaintiffs assert, "Officer Dalie called a code, which alerted other guards to respond to his location," and Officers Rubalcava, Mendoza, Valencia, and Del Toro responded to the code. (*Id.*, ¶¶ 116-117)

Plaintiffs allege, "Sergeant Rubalcava approached Medina, put his arm around Medina's neck and held him in a chokehold while Officer Dalie attempted to handcuff Medina and Officers Valencia and Mendoza put Medina in leg shackles." (Doc. 24 at 16, ¶ 117) In addition, Plaintiffs assert:

> After placing Medina in leg shackles and placing Medina's right hand in the handcuffs, Officer Dalie began to punch Medina in the side of his abdomen. Officers then performed an unnecessary and violent maneuver on Medina, known as "tossing." With one officer stepping on the chain separating Medina's leg cuffs, another offer shoved Medina from behind, causing him to fall forward. He twisted slightly to avoid falling on his face, and ended up crashing down onto his right side.
> Once on the ground, Officer Dalie applied pressure to Medina's back and Sergeant Rubalcava choked him again. The officers secured Medina's left hand in handcuffs behind his and brought Medina to his feet and pined him again against the wall.

(*Id.*, ¶¶ 118-119) According to Plaintiffs, the handcuffing of Medina's hands behind his back, rather than the front of his body, "caused unnecessary pain" because he "has a known medical requirement that his hands be handcuffed in front of his body or in waist chains." (*Id.* at 17, ¶ 120) They also allege

the offers caused "unnecessary pain by holding Medina's handcuffed arms straight out behind him and lifting up so that his arms were closer to parallel with the ground." (*Id.*)

Plaintiffs assert Sergeant Rubalcava "ordered Officer Mendoza, a female guard, to pat down Medina." (Doc. 24 at 17, ¶ 121) Mendoza contends he "attempted to position himself in a manner that would allow for the pat down, but Sergeant Rubalcava continuously forced Medina against the wall" and another officer "attempted to kick Medina's legs apart," despite the leg shackles. (*Id.*, ¶¶ 121-122) He alleges that during the pat down, Officer Mendoza loosened the strong on his sweat pants, which caused his pants to fall and exposed his genitals. (*Id.*, ¶ 123)

Medina reports that after the pat down, he was escorted outside by unspecified officers, while he was "in a tank top with his pants down, … both his hands and legs cuffed, and his hands held up in an excruciating manner." (Doc. 24 at 17, ¶ 124) He alleges he "pleaded with the guards to raise his pants and allow him to cover himself," but "was again thrown to the ground." (*Id.*, ¶¶ 126-127) Plaintiffs assert allege Officer Del Toro then approached Medina with a wheelchair, which Medina was placed in "further exposing his genitals." (*Id.*, ¶ 128) Medina asserts the manner in which he was placed in the wheelchair "kept his hands straight and lifted over the back of the wheelchair" and "caused his feet to drag." (*Id.*) Plaintiffs assert that Lieutenant Tegtmeyer "observed the situation … [and] made encouraging remarks to the officers." (*Id.* at 18, ¶ 129)

Plaintiffs allege Medina was removed from the wheelchair and walked to the Unit A Program Office, where "Sergeant Rubalcava and Officer Valencia slammed plaintiff Medina's head into the wall, causing his head to bleed." (Doc. 24 at 18, ¶¶ 130, 131) Plaintiffs assert Medina was placed in the cell "with his hands cuffed behind his back, his legs chained, and his pants pulled down." (*Id.*, ¶131) He reports that "his pleas to go to the bathroom or have water were ignored." (*Id.*, ¶ 135)

According to Plaintiffs, "About 30 minutes into his confinement, Lieutenant Tegtmeyer came to his cell and began making sexual comments to Medina." (Doc. 24 at 18, ¶ 137) Specifically, Plaintiffs allege: "He told other guards, in front of Medina, that Medina had not been with a man in a long time. He suggested that he take Medina to a room around the corner to have sex with him. He said no one would know because Medina was already bloodied up from the attack." (*Id.*) As a result, "Medina grew concerned that he would be sexually assaulted or raped by Lieutenant Tegtmeyer." (*Id.*)

Plaintiffs allege that after about four hours in the cell, "Medina was released and allowed to go to medical to have an evaluation performed on him." (Doc. 24 at 18, ¶ 138) Plaintiffs assert Medina's injuries included "a dislocated shoulder that was so severe that he could see a bone tenting his skin," and "cuts on his head and ankles." (*Id.* at 19, ¶ 139) Plaintiffs report the nurses who evaluated Medina "were visibly distraught," but "they simply documented [the injuries] and released him back to the officers so that he could be placed in Administrative Segregation." (*Id.* at 18-19, ¶ 138) Medina asserts he also now "suffers from carpel tunnel and nerve damage in his wrists," "loses grip strength intermittently[,] and suffers from chronic pain." (*Id.*)

Plaintiffs assert Medina "was denied medical treatment," and his "co-pay slips requesting medical care were ignored." (Doc. 24 at 19, ¶¶ 140-141) "Medina went on [a] hunger strike to draw attention to his needs" beginning January 10, 2017," and then "filed a 602 requesting medical care on January 15, 2017." (*Id.*, ¶¶ 142-143) However, Plaintiffs report that "Medina was not provided medical care until he was moved to California Institute of Women on February 28, 2017." (*Id.*, ¶ 144)

**II.     Procedural History**

Plaintiffs initiated this action by filing a complaint for violations of their civil rights under 42 U.S.C. § 1983 and the Americans with Disabilities Act on November 9, 2017. (Doc. 1) The Court issued summons as to all defendants on November 13, 2017. (Docs. 2-5) The same date, the Court issued its new civil case documents, including an "Order Setting Mandatory Scheduling Conference," which reminded Plaintiffs of the obligation to "diligently pursue service of the summons and complaint." (Doc. 6 at 2) On February 13, 2018, Plaintiffs filed proofs of service indicating Scott Kerman, Israel Trevino, Abdel Dalie, Jason Collier, Officer Del Toro, Officer Rubalcava, Officer Reynolds, and Governor Brown had been served with the summons and complaint. (Docs. 11-18) However, no proof of service was filed for defendant Timothy Tegtmeyer.

On April 23, 2018, the Court issued an order reclassifying this action as a civil matter. (Doc. 23) At the same time, the Court ordered Plaintiffs to show cause why the complaint should not be dismissed to the extent defendants were sued in their official capacities, observing that "states cannot be sued in federal court for violating § 1983" and the Eleventh Amendment, "in general, bars suits for damages against state officials in their official capacities because, in effect, this is a claim against the

entity." (*Id.* at 2, citing *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985))  Further, the Court directed Plaintiffs to show cause why their claim for violations of the Americans with Disabilities Act should not be dismissed because "liability under Title II of ADA may not be imposed on individuals." (*Id.*, citing *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002).  In the alternative, Plaintiffs were directed to file an amended complaint that addressed these deficiencies.  (*Id.* at 3)

Plaintiffs filed their First Amended Complaint on May 1, 2018.  (Doc. 24)  Plaintiffs assert their rights arising under the First and Eighth Amendments to the United States Constitution have been violated by Defendants, including: Scott Kernan, Secretary of the CDCR; Janel Espinoza, Acting Warden of CCWF; Derral Adams, former Acting Warden; Deborah Johnson, Former Acting Warden; Lieutenant Timothy Tegtmeyer; Sergeant Jason Collier; Officer Miguel Herrera; Officer Steven Reynolds; Officer Israel Trevino; Officer Abdel Dalie; Sergeant Rubalcava; Officer Valencia; and Officer Albert Del Toro.  (*See* Doc. 24 at 1-2; *id.* at 3, ¶ 7)  Specifically, Plaintiffs contend the defendants are liable for: (1) excessive force in violation of the Eighth Amendment; (2) denial of medical care in violation of the Eighth Amendment; (3) sexual abuse and harassment in violation of the Eighth Amendment; (4) retaliation in violation of the First Amendment; and failure to adequately hire, train, supervise, and discipline corrections officers.  (Doc. 24 at 21-23)  Plaintiffs request "injunctive relief in favor of plaintiffs Ayestas, Lara and Medina from future wrongdoing;" "declaratory relief in favor of plaintiffs Ayestas, Lara and Medina;" and monetary damages for the claims presented.  (*Id.* at 24, ¶ 175)

On July 16, 2018, Defendants filed the motion now pending before the Court, seeking to have the claims of Rojas, Lara, and Ayestas severed from the claims of Medina.  (Doc. 30 at 1-2)  In addition, Defendants also challenge the factual sufficiency of Plaintiffs' claims pursuant to Rule 12(b)(6).  (*Id.* at 2)  Plaintiffs filed their opposition to the motions on August 15, 2018 (Doc. 34), to which Defendants filed their reply on August 22, 2018 (Doc. 35)

On August 28, 2018— the eve of the hearing on the motions to dismiss—Plaintiffs filed a proof of service indicating Timothy Tegtmeyer was served with the summons and First Amended Complaint

on August 17, 2018.[2]  (Doc. 36)

## III.    Motion to Sever

Defendants argue that "Plaintiffs' claims are misjoined and should be severed because the claims arise out of two separate incidents against two separate groups of Defendants."  (Doc. 30-1 at 14, emphasis omitted)

### A.    Joinder of Claims

Rule 20 of the Federal Rules of Civil Procedure governs the joinder of defendants, and is designed to promote judicial economy and trial convenience.  *See Mosley v. Gen. Motors*, 497 F.2d 1330, 1332-33 (8th Cir. 1974).  Pursuant to Rule 20(a), joinder of defendants is proper if: "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).

"The 'same transaction' requirement of Rule 20 refers to 'similarity in the factual background of a claim; claims that arise out of a systematic pattern of events' and have a 'very definite logical relationship.'" *Hubbard v. Hougland*, 2010 WL 1416691, at *7 (E.D. Cal. Apr. 5, 2010) (quoting *Bautista v. Los Angeles County*, 216 F.3d 837, 842-843 (9th Cir. 2000)). In addition, "the mere fact that all [of a plaintiff's] claims arise under the same general law does not necessarily establish a common question of law or fact." *Coughlin v. Rogers*, 130 F.3d 1348, 1351 (9th Cir. 1997). However, "even once [the Rule 20(a)] requirements are met, a district court must examine whether permissive joinder would 'comport with the principles of fundamental fairness' or would result in prejudice to

---

[2] In relevant part, Rule 4(m) of the Federal Rules of Civil Procedure provides that "[i]f defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."  The deadline for service may be extended "if the plaintiff shows good cause for the failure" to serve within the specified time.  *Id.*
    The Court issued the summons for Timothy Tegtmeyer on November 13, 2017.  (Doc. 4)  As a result, Plaintiffs were required to serve the summons and complaint within ninety days, or no later than February 12, 2018.
    Plaintiffs did not request an extension of time and the Court has no information regarding why service was not completed until August 17, 2018.  The Court was prepared to issue an order to show cause to Plaintiffs for their failure to "diligently pursue service of the summons and complaint" (*See* Doc. 6 at 1-2) and failure comply with the deadline imposed by Rule 4(m) after the hearing on the motion now before the Court.
    **Plaintiffs are cautioned that future failures to comply with the orders of this Court, the Local Rules, and the Federal Rules of Civil Procedure may result in the imposition of sanctions, including terminating sanctions.** *See, e.g. Ferdik v. Bonzelet*, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (dismissal for failure to comply with an order); *Malone v. U.S. Postal Service*, 833 F.2d 128, 130 (9th Cir. 1987) (imposing terminating sanctions for failure to comply with a court order); *Henderson v. Duncan*, 779 F.2d 1421, 1424 (9th Cir. 1986) (dismissal for failure to prosecute and to comply with local rules).

11

either side." *Coleman v. Quaker Oats Company*, 232 F.3d 1271, 1296 (9th Cir. 2000) (citing *Desert Empire Bank v. Ins. Co. of North America*, 623 F.2d 1371, 1375 (9th Cir. 1980) (finding the district court did not abuse its discretion when it severed certain plaintiff's claims without finding improper joinder)).

Under Rule 20(b), the district court may sever claims or parties to avoid prejudice. Fed. R. Civ. P. 20(b). Courts have also exercised the discretion to sever where "[i]nstead of making the resolution of [the] case more efficient . . . joinder would instead confuse and complicate the issues for all parties involved." *Wynn v. National Broadcasting Co.*, 234 F. Supp. 2d 1067, 1088 (C.D. Cal. 2002) (finding that even where Rule 20 requirements for joinder are satisfied, the Court may exercise its discretion "to sever for at least two reasons: (1) to prevent jury confusion and judicial inefficiency, and (2) to prevent unfair prejudice to the [defendants]").

In addition, "[o]n a motion or on its own, the court may at any time, on just terms, add or drop a party" and "sever any claim against a party." Fed. R. Civ. P. 2. However, "[m]isjoinder of parties is not a ground for dismissing an action." *Id.* The proper remedy for misjoinder is to sever misjoined parties and dismiss claims against them, provided that "no substantial right will be prejudiced by the severance." *Coughlin*, 130 F.3d at 1350.

**B.      Discussion and Analysis**

Defendants argue that "Plaintiffs cannot satisfy either prong of Rule 20(a)," because their claims "as well as their respective claims against the individual Defendants, do not rise out of the same transaction or occurrence" and they do not "share common questions of law or fact." (Doc. 30-1 at 15) Therefore, Defendants contend "the Court should sever Plaintiffs Rojas, Lara, and Ayestas's 2015 claims from Plaintiff Medina's 2017 claims" pursuant to Rule 21. (*Id.*) Plaintiffs oppose severance of the claims, arguing the claims "arise out of a systematic pattern of events." (Doc. 34 at 10)

1.      "Same transaction or occurrence"

The first prong in Rule 20 refers to "similarity in the factual background of a claim; claims that arise out of a systematic pattern of events" and have a "very definite logical relationship" arise out of the same transaction and occurrence. *Bautista v. Los Angeles County*, 216 F.3d 837, 842-843 (9th Cir. 2000) (Reinhardt, J., concurring) (citation omitted); *see also Visendi v. Bank of Am., N.A.*, 733 F.3d

863, 870 (9th Cir. 2013) (explaining the first requirement of Rule 20(a) "requires factual similarity in the allegations supporting Plaintiffs' claims").

Plaintiffs assert their claims satisfy the first prong of Rule 20 because "[t]hey allege that there is a custom and practice employed by guards at Central California Women's Facility to engage in sexual harassment and degradation, including violent abuse, punitive confinement to a cage meant for programming, denial of basic needs such as water and restroom use, denial of medical care, and retaliation for complaints." (Doc. 34 at 10) (citations omitted). In addition, Plaintiffs assert their claims—for events "separated by a little less than 14 months"— "share common defendants: lieutenant Timothy Tegtmeyer, Janel Espinoza and Scott Kernan." (*Id.*) In support of their contentions that the Rule 20(a) requirements are satisfied, Plaintiffs direct the Courts' attention to *Battison v. City of Electra*, 2001 WL 497769, at *2 (N.D. Tex. May 8, 2001) and *Kedra v. City of Philadelphia*, 454 F. Supp. 652, 662 (E.D. Pa. 1978). (Doc. 34 at 10)

In *Battison*, the plaintiffs alleged that the city had "engaged in a in a pattern or practice of violating the constitutional rights of its citizens by engaging in negligent hiring, supervision, and retention." *Id.*, 2001 WL 497769, at *1. The court determined "[t]his allegation alone suffices to meet Rule 20(a)'s common transaction or occurrence requirement." *Id.* Further, the court observed that "[e]ach individual officer named in the suit participated in more than one of the alleged incidents"— which took place within a six-month period — "and the behavior described on the part of these officers had common characteristics," including accusations of excessive force, searches and seizures without probable cause, and unlawful censoring of the Plaintiffs' freedom of expression." *Id.* at *1-2. Thus, the court concluded the requirements of Rule 20(a) were satisfied, and denied the defendants' motion to severe. *Id.* at *2-3.

In *Kedra*, the plaintiffs were all members of the Kedra family, who identified events that "span[ned] one and one-half years, from December 1975 to February or March 1977." *Id.*, 454 F.Supp at 657. In December 1975, the plaintiffs alleged three Kedra family members "were handcuffed, struck about the head, face, stomach, abdomen, arms and legs with fists and physical objects, were harassed and threatened with further physical violence." *Id.* at 658. The wife of one of the men was then "forcibly" taken from her home to the police headquarters "where she was detained and questioned for

seventeen hours," "not advised of her rights," and "threatened with arrest in an attempt to coerce a false statement from her." *Id.* When their mother voluntarily went to the police station, "she was illegally interrogated, coerced into signing a release authorizing the search of her house and forcibly detained for nine hours." *Id.* Seven days later, officers went to the Kedra home and demanded entrance. *Id.* The plaintiffs alleged that the officers broke open the door, blocked the exists, performed a search without a warrant, and then took four family members to the police station. *Id.* at 658-59. The plaintiffs also alleged one of the family members was arrested and beaten by an officer in June 1976, and another Kedra family member was "threatened with physical violence" in early 1977. *Id.* at 659. Faced with these facts, the court found the requirements of Rule 20(a) were satisfied, stating:

> Although the events giving rise to plaintiffs' claims in this case occurred over a lengthy time period, they all are "reasonably related." The complaint sets forth a series of alleged unlawful detentions, searches, beatings and similar occurrences and charges defendants with "engag(ing) in a systematic pattern of harassment, threats and coercion with the intention of . . . depriving plaintiffs of (their) rights"; each of the incidents set forth is encompassed within the "systematic pattern." There is no logical reason why the systematic conduct alleged could not extend over a lengthy time period and, on the face of these allegations, there is nothing about the extended time span that attenuates the factual relationship among all of these events. The claims against the defendants "aris(e) out of the same transaction, occurrence, or series of transactions or occurrences" for purposes of Rule 20(a), and therefore joinder of defendants in this case is proper.

*Id.*, 454 F.Supp at 662 (modifications in original)

Significantly, here, the facts alleged in the complaint do not include allegations of an official "custom and practice" by either the CDCR or officers at CCWF. (*See generally* Doc. 24) This alone distinguishes the matter before the Court from the facts presented to the Northern District of Texas in *Battison.* In the First Amended Complaint, Plaintiffs refer to a report issued by the Prison Law Office related to *Armstrong et al. v. Brown et al.* No. CV-94-02307-CW to allege an unlawful "culture of intolerance" exists at CCWF. (*See id.* at 2-3, ¶¶ 3-4) (emphasis omitted) However, Plaintiffs offer only the legal conclusions of the law firm concerning retaliation; excessive force; sexual abuse; and "a culture of bigotry, sexual harassment, and casual misogyny." (*Id.*) Plaintiffs do not identify what facts were examined to reach these conclusions, and do not themselves allege any facts to support the conclusions of that law firm. Indeed, the only allegation regarding a "practice" is that "[w]ithout remedy in the form of injunctive and declaratory relief against defendant Kernan and defendant Espinioza, … unconstitutional practices will continue and plaintiffs will continue to suffer." (*Id.* at 3, ¶

14

6)  These conclusions, without more, fail to show a common custom or practice that was in place between 2015 and 2017 at CCWF.  Moreover, as discussed below, Plaintiffs fail to allege facts sufficient to support their claims for unconstitutional sexual harassment, denial of medical care for serious medical needs, and retaliation.  In that manner, Plaintiffs have failed to establish a custom of unconstitutional violations.[3]

Further, the facts now before the Court must be distinguished from *Kedra*, where the plaintiffs were several family members who faced repeated harassment over the extended period.  In addition, and more "importantly [is] the fact that the defendants overlapped" (Doc. 35 at 5), because the same officers were involved in events that occurred in both 1975 and 1977.  *See Kedra*, 45 F.Supp. at 660 (identifying each of the officers involved).  In contrast, here the incidents in 2015 and 2017 did not involve members of the same family, and only Lieutenant Tegtmeyer had some involvement in both incidents.

Finally, the Court notes that both *Kedra* and *Battison* included claims against municipalities, which were subject to *Monell* liability, while no such claim is presented here.  This also distinguishes the cases cited by Plaintiffs from the matter before the Court.

The Court is unable to find the two events that occurred at CCFW in 2015 and 2017 establish a "systematic pattern" or "series of events," such that "same transaction" requirement of Rule 20(a) is satisfied.  *See Hubbard*, 2010 WL 1416691, at *7.

## 2.    Conclusion

Because Plaintiffs have not met the same transaction or occurrence requirement of Rule 20(a), the Court need not address whether Plaintiffs satisfied the second requirement, that there be a common question of law or fact.  *Corley v. Google, Inc.*, 316 F.R.D. 277, 289 (N.D. Cal. 2016).

Defendants have demonstrated that severance is appropriate under Rules 20 and 21 of the Federal Rules of Civil Procedure. Therefore, the Court recommends Defendants' motion for misjoinder be **GRANTED**, and the claims of Medina be severed this action.

///

---

[3] To the extent Plaintiffs now refer to the incidents in both 2015 and 2017 involving "denial of basic needs such as water and restroom use" (Doc. 34 at 10), a "denial of basic needs" claim is not presented in the First Amended Complaint.

## IV.     Motion to Dismiss

Under the Federal Rules of Civil Procedure, a defendant may file a motion to dismiss for a plaintiff's failure to state a claim upon which relief can be granted prior to filing a responsive pleading.  Fed. R. Civ. P. 12(b)(6).  Here, Defendants challenge the merits of each of the claims for relief presented in the First Amended Complaint.  (*See* Doc. 30 at 2; Doc. 30-1 at 18-26)

### A.     Legal Standards

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal under Rule 12(b)(6) is appropriate when "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  On a motion filed pursuant to Rule 12(b)(6), "review is limited to the complaint alone."  *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993).

Allegations of a complaint must be accepted as true when the Court considers a motion to dismiss for failure to state a claim.  *Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 740 (1976).  The Supreme Court explained, "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Supreme Court explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.

*Iqbal*, 556 U.S. at 678 (internal citations, quotation marks omitted).

A court must construe the pleading in the light most favorable to the plaintiff, and resolve all doubts in favor of the plaintiff.  *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  However, the Court

16

"will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Assoc. v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). Leave to amend should not be granted if "it is clear that the complaint could not be saved by an amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

## B. Section 1983 Claims

Section 1983 "is a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must allege a specific injury was suffered, and show causal relationship between the defendant's conduct and the injury suffered. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). A person deprives another of a right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

## C. First Claim for Relief: Excessive Force

In the First Amended Complaint, the first claim for relief is raised "[b]y plaintiffs against defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro in their individual and official capacities." (Doc. 24 at 21) (emphasis omitted). Specifically, Plaintiffs allege these defendants "while under color of law, used excessive and unnecessary force and in doing so acted maliciously and sadistically for the purpose of causing harm and not in a good faith effort to maintain or restore discipline, causing harm to plaintiffs, in violation of their right under the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishment." (*Id.* at 21, ¶ 163)

17

Defendants contend the claim for excessive force "against Officers Reynolds, Trevino and Del Toro should be dismissed because there are no facts to suggest they acted with malicious and sadistic purpose to cause harm." (Doc. 30-1 at 25)

### 1. Excessive Force under the Eighth Amendment

The Eighth Amendment protects inmates from inhumane methods of punishment and conditions of confinement. *See Farmer v. Brennan*, 511 U.S. 825 (1994); *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). One of the "basic human needs" that prison officials must provide is personal safety, and prison officials have a duty to take reasonable steps to protect inmates from physical harm. *Hoptowit v. Ray*, 682 F.2d 1237, 1247, 1250-51 (9th Cir. 1982). To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

"Whether a particular event or condition in fact constitutes 'cruel and unusual punishment' is gauged against 'the evolving standards of decency that mark the progress of a maturing society.'" *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). However, the Supreme Court has determined that "when prison officials maliciously and sadistically use force to cause harm contemporary standards of decency are always violated." *Id.* (citing *Hudson*, 503 U.S. at 9). In such circumstances, "the only requirement is that the officer's actions be 'offensive to human dignity,'" and a physical injury is not necessary to establish a claim. *Id.* (quoting *Felix v. McCarthy*, 939 F.2d 699, 702 (9th Cir. 1991)).

The Supreme Court determined that "[n]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins v. Gaddy*, 130 S.Ct. 1175, 1178 (2010) (quoting *Hudson*, 503 U.S. at 9). Factors that can be considered are "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." *Whitley v. Albers*, 475 U.S. 312, 321 (1986); *Marquez v. Gutierrez*, 322 F.3d 689, 692 (9th Cir. 2003). Although the extent of the injury is relevant, the inmate does not need to sustain serious injury. *Hudson*, 503 U.S. at 7; *Wilkins*, 130 S. Ct. at 1178-79. The prohibition on cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force. *Hudson*, 503 U.S. at 9-10.

///

18

2.      Liability of Officer Reynolds

Defendants contend the claim against Officer Reynolds should be dismissed because "there are no allegations of excessive force against Officer Reynolds," and "the only allegation is that he placed handcuffs on Plaintiff Ayestas."  (Doc. 30-1 at 26, citing Doc. 24, ¶ 41)

In response, Plaintiffs contend they "plead sufficient facts" against Reynolds, because he "played an integral role in the constitutional violations alleged in the complaint."  (Doc. 34 at 24, citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007))  Plaintiffs observe that the Ninth Circuit determined "integral participation does not require that each officer's actions themselves rise to the level of a constitutional violation."  (*Id.*, quoting *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004)).  Instead, Plaintiffs contend "[i]t is enough" that the individual officers, such as Reynolds, "had some 'fundamental involvement in the conduct that allegedly caused the violation.'"  *Id.* (quoting *Blankenhorn,* 485 F.3d at 481 n.12)  Thus, Plaintiffs contend "[o]fficers who stand as armed guards during an officer's unconstitutional search are integrally involved in the violation of constitutional rights," as is an officer—such as Reynolds— "who handcuffs the person against whom excessive force has been used."  (*Id.*)

Plaintiffs argue that in the First Amended Complaint, they "allege that on November 11, 2015, nine to 10 officers, including Officer Reynolds, participated in the retaliatory search, assault, and post-assault harassment and deprivations of basic human needs."  (Doc. 34 at 24, citing Doc. 24 at ¶¶ 37, 41)  Further, Plaintiffs assert they "allege with specificity that officer[] … Reynolds engaged in the post-assault sexual harassment and as a result, was also an integral participation in plaintiffs' torment," which included taking Rojas and Lara "outside in exceedingly cold temperatures in thin, soiled clothing."  (*Id.* at 24-25, citing Doc. 24 ¶ 79)

In reply, Defendants contend this action must be distinguished from the facts before the Ninth Circuit in *Blankenhorn*, because "Plaintiffs are confounding their claims regarding various constitutional violations."  (Doc. 35 at 12-13)  Particularly, Defendants observe "[t]he alleged assault, which forms the basis of Plaintiffs' excessive force claim, and in which Reynolds and Trevino are not alleged to have been involved, occurred around 2:00 p.m. in the housing unit," and Rojas and Lara were not taken outside with Officer Reynolds until approximately 11:00 p.m.  (Doc. 35 at 13, citing

Doc. 24 at ¶¶ 32, 37-43, 79). Because there are no allegations that Reynolds "participated in any way… in the alleged use of force nine hours earlier," Defendants conclude the claim for excessive force against Officer Reynolds must be dismissed. (*Id.*)

Notably, in *Blankenhorn*, the Ninth Circuit addressed a situation in which a pre-trial detainee was tackled by several officers, to determine whether the officers were liable for violations of Blankenhorn's rights. The officers encountered an individual who they believed was a suspect for trespassing. *Id.*, 485 F3d. at 468-69. When the officers confronted Blankenhorn, he became angry and agitated, but was nonviolent. *Id.* The officers ordered him to his knees to be handcuffed, but he did not comply. *Id.* In response, three officers gang-tackled him; took him to the ground; and after the officers were on top of him, an officer punched him in the head and body. *Id.* at 469-70. The officers handcuffed Blankenhorn and put him in hobble restraints. *Id.* at 469. Reviewing the officers' possible "integral participation" during the altercation, the Ninth Circuit found:

> Kayano's help in handcuffing the prone Blankenhorn was, of course, meaningful participation in the arrest. It is true that Blankenhorn does not claim Kayano used excessive force in handcuffing him, and Ross, not Kayano, placed the ripp-hobbles on Blankenhorn's wrists and ankles. But Kayano's own declaration indicates that his help in handcuffing Blankenhorn was instrumental in the officers' gaining control of Blankenhorn, which culminated in Ross's application of hobble restraints. Therefore, Kayano's participation was integral to the use of the hobble restraints. [Citation.]
>
> It follows that Gray, who ordered Ross to use the hobble restraints, and Nguyen and South, who tackled Blankenhorn, also participated in an integral way in the application of the hobble restraints. Accordingly, Gray, Nguyen, Ross, South, and Kayano may be held liable for this particular alleged use of excessive force.

485 F.3d at 481 (citing *Chuman v. Wright,* 76 F.3d 292, 294-95 (9th Cir. 1996)).

Here, in contrast, the only allegation addressing the use of force by Officer Reynolds was: "As plaintiff Ayestas exited the laundry room, she was commanded to position herself on the ground face down where she was placed in handcuffs by Officer Steven Reynolds." (Doc. 24 at 8, ¶ 41) (emphasis omitted) In contrast to *Blankenhorn*, the force used was not instrumental in gaining control over Ayestas who, it seems, complied with the command to get on the ground. (*See id.*) Rather, the only force used by Reynolds was the placing of the handcuffs. Notably, this Court previously observed that "[g]enerally, handcuffing an inmate involves some *de minimis* use of force." *Washington v. Hernandez,* 2017 U.S. Dist. LEXIS 207713, at *8 (E.D. Cal. Dec. 18, 2017). Indeed, here, there are no

facts alleged that the handcuffing was tighter than necessary or that Ayestas suffered any lingering injury from the force Reynolds used to cuff her.[4]  Thus, the facts alleged do not support a claim of excessive force by Ayestas against Reynolds through the placement of handcuffs.

Moreover, there are no facts alleged supporting a conclusion that Reynolds used any force— let alone excessive force in violation of the Eighth Amendment—against plaintiffs Rojas, Lara, or Medina.[5],[6]  Accordingly, the Court recommends the claim for excessive force against Officer Reynolds be **DISMISSED** with leave to amend.

### 3. Liability of Officer Trevino

In response, Plaintiffs contend there are facts sufficient to support their claim in the First Amended Complaint.  (Doc. 34 at 24)  As with the claim against Officer Reynolds, Plaintiffs contend Officer Trevino "played an integral role" "in the harassment, assault, and deprivation of constitutional rights."  (*Id.*, emphasis omitted)

Significantly, however, the *only* allegation in the First Amended Complaint relating to Officer Trevino is that he "stood with Rojas and Lara and sexually harassed them," when the prisoners were taken from the isolation cages and taken outside."  (*See* Doc. 24 at 13, ¶ 79)  The facts alleged do not support a conclusion that Officer Trevino used any force against the any of the plaintiffs, or even the conclusion that he *witnessed* the use of any force—let alone unconstitutional force— by other officers against the plaintiffs.  Given the lack of factual allegations, the Court recommends the first claim for relief, to the extent it is stated against Officer Trevino, be **DISMISSED** with leave to amend.

### 4. Liability of Officer Del Toro

---

[4] Plaintiffs allege Ayestas's injuries came from the physical encounter with Lieutenant Tegtmeyer and Officer Collier in the bathroom.  In particular, Plaintiffs allege, "Ayestas had a black eye from her face hitting the toilet. She had bruises and injury to her back and shoulder from having a knee and the full weight of an officer pressed into her back and having her arm twisted as she was slammed into a wall. She still experiences chronic pain in her back and shoulder from the assault."  (Doc. 24, ¶ 87)

[5] To the extent Plaintiffs are now attempting to characterize the excessive force claim against Officer Reynolds as a "failure to protect" claim by Rojas and Lara, this theory of liability is not presented in the First Amended Complaint.

In addition, while Plaintiffs now seem to assert that Officer Reynolds was one of the officers who searched the cell, and also imply that Reynolds stood as an "armed guard during … [the] unconstitutional search" (Doc. 34 at 24), the pleadings do not support these conclusions. Plaintiffs fail to identify by name any of the officers who searched the cell while Sergeant Collier oversaw the operation. Further, is not clear that Reynolds present when force was used against Rojas and Lara, because Ayestas was handcuffed by Reynolds as she "exited the laundry room" – and Rojas and Lara were in the day room. (Doc. 24 at 8, ¶¶ 36, 41)

[6] There are no facts alleged that Officer Reynolds interacted with Medina in any way during the incident that occurred in 2017.

21

Defendants contend the claim for excessive force against Officer Del Toro should be dismissed, because "Plaintiffs merely alleged that Officer Del Toro approached Plaintiff Medina with a wheelchair and asserted no other allegations." (Doc. 30-1 at 26)

In response, Plaintiffs argue they pled facts sufficient to support a claim for excessive force against Officer Del Toro, based upon the following allegations:

> Plaintiffs allege that on January 5, 2017, Officer Del Toro integrally participated in plaintiff Medina's attack by responding to officer Dalie's code. (FAC at ¶ 116.) Plaintiff Medina alleged that the officers then present, which at that time included Officer Del Toro, "performed an unnecessary and violent maneuver on Medina, known as 'tossing.' With one officer stepping on the chain separating Medina's leg cuffs, another officer shoved Medina from behind, causing him to fall forward." (FAC at ¶ 118.) Finally, Officer Del Toro also retrieved a wheelchair for Medina, which officers then set him in with his handcuffed arms raised over the back of the chair, for the sole purpose of causing pain. (FAC at ¶ 128.)

(Doc. 34 at 25)

Importantly, however, Plaintiffs now characterize the involvement of Officer Del Toro differently than a plain reading of the allegations in the First Amended Complaint would indicate. Plaintiffs alleged that when "Officer Dalie called a code," the responding officers were Rubalcava, Mendoza, Valencia, and Del Toro. (Doc. 24 at 16, ¶¶ 115-116) There are no allegations regarding who arrived to the location or when, but Plaintiffs also allege:

> Sergeant Rubalcava approached Medina, put his arm around Medina's neck and held him in a chokehold while Officer Dalie attempted to handcuff Medina an Officers Valencia and Mendoza put Medina in leg shackles.
>
> After placing Medina in leg shackles and placing Medina's right hand in the handcuffs, Officer Dalie began to punch Medina in the side of his abdomen. Officers then performed an unnecessary and violent maneuver on Medina, known as "tossing." With one officer stepping on the chain separating Medina's leg cuffs, another officer shoved Medina from behind, causing him to fall forward. He twisted slightly to avoid falling on his face, and ended up crashing down onto his right side.
>
> Once on the ground, Officer Dalie applied pressure to Medina's back and Sergeant Rubalcava choked him again. The officers secured Medina's left hand in handcuffs behind his and brought Medina to his feet and pined (sic) him again against the wall.

(Doc. 24 at 16-17, ¶¶ 117-119) Thus, from these allegations, it is clear the officers who interacted with Medina at that time included Rubalcava, Dalie, Valencia, and Mendoza. However, there are no facts alleged supporting a conclusion that Officer Del Toro had arrived at the location or was involved in the "tossing."

The Court cannot presume, as Plaintiffs would have it, that Officer Del Toro was involved in the "tossing" maneuver when the only allegations related to Officer Del Toro are that he responded to the code and "approached Medina with a wheelchair." (Doc. 24 at 16-17, ¶¶ 116, 128)  Indeed, the allegation that "officers set Medina in a wheelchair" is too vague for the Court to determine which officers placed Medina in the wheelchair, and to what extent force was used to do so. Without additional facts, the Court is unable to find Officer Del Toro used any force—let alone excessive force — upon Medina.

Moreover, there are no facts alleged supporting a conclusion that Officer Del Toro use any force upon Rojas, Ayestas, or Lara.  Indeed, there are no facts alleged that the officer interacted with these plaintiffs at any point during the incidents in 2015.  Accordingly, the Court recommends Defendants' motion to dismiss the first cause of action for excessive force, to the extent it is stated against Officer Del Toro, be **GRANTED**.

## D.    Second Claim for Relief:  Denial of Medical Care

All plaintiffs seek to state a claim for denial of medical care in violation of their Eighth Amendment rights "against defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro, in their individual and official capacities." (Doc. 24 at 21-22, emphasis omitted)

Defendants contend this claim should be dismissed "because there are no allegations that any of the defendants disregarded Plaintiffs' serious medical needs." (Doc. 30-1 at 20, emphasis omitted)  In response, Plaintiffs assert the "plead a viable Eighth Amendment denial of medical care claim." (Doc. 34 at 15) (emphasis omitted)

### 1.    Eighth Amendment Standards

As individuals in custody must rely upon officials for medical care, "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), (internal citation, quotation marks omitted).  To state a cognizable claim for inadequate medical care under the Eighth Amendment, Plaintiffs "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.*, 429 U.S. at 106.  Thus, the Ninth Circuit explained: "First,

23

the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

### a. Serious medical need

A serious medical need exists "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (quoting *Estelle*, 429 U.S. at 104). Indications of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990).

### b. Deliberate indifference

If a plaintiff establishes the existence of a serious medical need, he must then show that officials responded to that need with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In clarifying the culpability required for "deliberate indifference," the Supreme Court held:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exits, and he must also draw that inference.

*Farmer*, 511 U.S. at 837. Therefore, a defendant must be "subjectively aware that serious harm is likely to result from a failure to provide medical care." *Gibson*, 290 F.3d at 1193 (emphasis omitted). When a defendant should have been aware of the risk of substantial harm but, indeed, was not, "then the person has not violated the Eighth Amendment, no matter how severe the risk." *Id.* at 1188.

Where deliberate indifference relates to medical care, "[t]he requirement of deliberate indifference is less stringent . . . than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns."

*Holliday v. Naku*, 2009 U.S. Dist. LEXIS 55757, at *12 (E.D. Cal. June 26, 2009) (citing *McGuckin*, 974 F.2d at 1060). Generally, deliberate indifference to serious medical needs may be manifested in two ways: "when prison officials deny, delay, or intentionally interfere with medical treatment, or . . . by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 393-94 (9th Cir. 1988). A claimant seeking to establish deliberate indifference must show "both (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need *and* (b) harm caused by the indifference." *Conn v. City of Reno*, 592 F.3d 1081 (9th Cir. 2010) (emphasis added).

### 2. Claim by Rojas

Plaintiffs assert that "Rojas suffered a skin lesion from a boot burn," (Doc. 34 at 17) which was caused by Sergeant Collier. (*See* Doc. 24 at 9, ¶ 43) In addition, Plaintiffs allege Rojas attempted hanging with a shoelace. (Doc. 24 at 12, ¶ 72) Plaintiffs contend, "The guards did not summon medical care and left Rojas in the[] cell for hours after." (Doc. 34 at 17, citing Doc. 24 at ¶¶ 76-77, 81) Thus, the Court must determine whether these allegations are sufficient to support a claim by Rojas.

#### a. *Serious medical need*

Plaintiffs fail to allege facts to support that the injuries suffered by Rojas, both from the boot burn and hanging with a shoelace, were serious medical needs. There is no information regarding the extent of the skin lesion that leads to a conclusion that medical care was reasonably necessary. Likewise, Plaintiffs fail to allege any facts supporting a conclusion that Rojas suffered any physical injury from the hanging attempt, which was stopped by the guards.

#### b. *Deliberate indifference*

Even assuming Rojas established the existence of a serious medical need, the facts alleged are not sufficient to demonstrate any of the defendants were deliberately indifferent to that medical need. There are no allegations supporting a conclusion that any of the defendants were aware of the skin lesion on Rojas' back. Similarly, Plaintiffs fail to identify which of the defendants were aware of the attempting hanging. Though Rojas requested medical attention, there are no facts regarding when the requests were made, or two whom. (*See* Doc. 24 at 13, ¶¶ 84-85) Finally, there also are no facts alleged supporting a conclusion that the defendants were "subjectively aware that serious harm [was] likely to result from a failure to provide medical care" to Rojas. *See Gibson* 290, F.3d at 1193.

///

3.      Claim by Ayestas

In the First Amended Complaint, Plaintiffs allege: "Ayestas had a black eye from her face hitting the toilet. She had bruises and injury to her back and shoulder from having a knee and the full weight of an officer pressed into her back and having her arm twisted as she was slammed into a wall. She still experiences chronic pain in her back and shoulder from the assault." (Doc. 24 at 13, ¶¶ 86) Further, Plaintiffs assert that "Ayestas suffers from flashbacks and night terrors as a result of the incident" and she "requested treatment for [Post Traumatic Stress Disorder] but was initially denied." (*Id.* at 14, ¶ 92)

a.      *Serious medical need*

Significantly, a black eye and bruising are not sufficient to establish a "serious medical need" within the meaning of the Eighth Amendment. *See, e.g., Dallio v. Hebert,* 678 F. Supp. 2d 35, 60 (N.D. N.Y. 2009) (black eyes, bruising, red spots, kick marks, and lacerations did not constitute a serious medical need); *Gerber v. Sweeney,* 292 F. Supp. 2d 700, 707-08 (E.D. Penn. 2003) (finding a black eye and laceration were not serious medical needs); *Vilchis v. City of Bakersfield,* 2012 WL 113747, *12 (E.D. Ca. Jan. 13, 2012) (abrasions and contusions to the head and face, with some bleeding, do not amount to a "serious medical need" for purposes of the Eighth Amendment). Thus, the black eye and bruising Ayestas suffered do not establish a serious medical need.

On the other hand, this Court, and others, have determined that PTSD is a serious medical need. *See, e.g., Dillman v. Vasquez,* 2015 WL 881574, at *14 (E.D. Cal. Feb. 27, 2015) (acknowledging "PTSD has been held to constitute a serious medical condition," and continuing the analysis to determine whether the defendants showed deliberate indifference to the need); *see also Bloodworth v. Krall*, 2011 WL 1043726, *4 (S.D. Cal. Mar. 22, 2011) ("[d]epression and PTSD certainly constitute serious medical conditions"). Thus, Ayestas has identified a serious medical need within the meaning of the Eighth Amendment.

b.      *Deliberate indifference*

Although Ayestas carries the burden to identify a serious medical need, she fails to allege when the condition manifested itself, that any of the named defendants were aware of her PTSD after the

event, or that they denied her requests for treatment.  Without additional facts, the Court is unable to determine the named defendants exhibited deliberate indifference to this medical need.

### 4.     Claim by Lara

Plaintiffs allege that "Lara's wrists were visibly injured, and her right breast was clearly bruised," and "[s]he suffered other bruising and pain from the force with which she hit the ground." (Doc. 24 at 13, ¶ 86)  Lara contends she "has lasting pain in her wrists, and her hip regularly locks up, causing her pain."  (*Id.*)  Further, they report Lara "experiences flashbacks, anxiety, trouble sleeping, and phantom physical sensation mimicking the pain she experienced that day."  (*Id.* at 14, ¶ 90)  Although "Lara requested treatment for PTSD[,] she never received it."  (*Id.*)

#### a.     *Serious medical need*

As explained above, bruising is not sufficient to establish a "serious medical need."  *See Dallio,* 678 F. Supp. 2d at 60; *Gerber,* 292 F. Supp. 2d at 707-08.  In addition, it is unclear whether the injury to Lara's wrists was one that "a reasonable doctor or patient would find important and worthy of comment or treatment."  *See McGuckin*, 974 F.2d at 1059-60.  However, to the extent that the injury caused Lara to have "chronic and substantial pain," it is a serious medical need.  *See id.*  Likewise, Lara's mental state—to the extent she has untreated PTSD— constitutes a serious medical need.

#### b.     *Deliberate indifference*

Lara fails to allege when she requested treatment for her medical need or to whom she made the request.  (*See* Doc. 24 at 14, ¶ 91) The facts alleged fail to support the conclusion that any of the named defendants knew of her serious medical need or that they were "subjectively aware that serious harm is likely to result from a failure to provide medical care."  *Gibson*, 290 F.3d at 1193.  Thus, the Court is unable to find any of the named defendants exhibited deliberate indifference to Lara's medical needs.

### 5.     Claim by Medina

Plaintiffs allege that about four hours after Medina's altercation with officers, "[he] was released and allowed to go to medical to have an evaluation performed on him."  (Doc. 24 at 18, ¶ 138) Plaintiffs assert Medina's injuries included "a dislocated shoulder that was so severe that he could see a bone tenting his skin," and "cuts on his head and ankles."  (*Id.* at 19, ¶ 139)  Plaintiffs report the nurses who evaluated Medina "were visibly distraught," but "they simple documented [the injuries] and

released him back to the officers so that he could be placed in Administrative Segregation." (*Id.* at 18-19, ¶ 138)  Medina asserts he also now "suffers from carpel tunnel and nerve damage in his wrists," "loses grip strength intermittently[,] and suffers from chronic pain." (*Id.*)

### a.    Serious medical need

The Court finds the allegations sufficient to establish that Medina had a serious medical need, particularly with the dislocated shoulder.  Indeed, the allegations demonstrate that unidentified officers believed Medina needed medical treatment and he was taken for treatment.

### b.    Deliberate indifference

Based upon the facts alleged, it is not clear *when* Medina suffered the dislocated shoulder.  The Court cannot presume at what point the injury occurred, or infer from the facts which officers – including the defendants—were aware of the injury he suffered and the need for medical treatment. Without facts identifying when the injury occurred or which officers knew of the injury, the Court is unable to find any of the named defendants exhibited deliberate indifference to Medina's serious medical needs.  In addition, Medina was provided medical care, though he disagrees it was sufficient. In any event, there are no facts alleged to demonstrate that the four-hour delay caused him any harm.

### 6.    Conclusion

As Defendants argue, "not only does the amended complaint not contain a single allegation that links the denial of medical care to a particular [d]efendant, Plaintiffs do not allege that any Defendant was responsible for their medical care." (Doc. 35 at 9)  Consequently, the Court recommends the second claim for relief be **DISMISSED** with leave to amend.

### E.    Third Claim for Relief: Sexual Abuse and Harassment

In the First Amended Complaint, Plaintiffs assert the claim for sexual abuse and harassment is stated "[b]y all plaintiffs against defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro, in their individual and official capacities." (Doc. 24 at 22, emphasis omitted)  Plaintiffs allege, "defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro sexually abused and harassed plaintiffs, an act deeply offensive to human dignity and one that serves no legitimate

penological purpose," and in doing so violated Plaintiff's Eighth Amendment rights.  (*Id.*, ¶ 168)

### 1.     Sexual abuse and harassment under the Eighth Amendment[7]

A sexual assault on an inmate by a prison official implicates the rights protected by the Eighth Amendment.  *Schwenk*, 204 F.3d at 1197; *see also Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) ("Sexual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm").  For this reason, severe or repetitive sexual abuse of an inmate by a prison officer can be "objectively, sufficiently serious" to constitute an Eighth Amendment violation. *Id.; see Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (noting the list of conditions held cruel and unusual by the Supreme Court is not exclusive).  Sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is "simply not part of the penalty that criminal offenders pay for their offenses against society." *Boddie*, 105 F.3d at 861 (quoting, *Farmer*, 511 U.S. at 834).

On the other hand, the Eighth Amendment protections "do not necessarily extend to mere verbal sexual harassment."  *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004); *Minifield v. Butikofer*, 298 F. Supp. 2d 900, 903-04 (N.D. Cal. 2004).  Courts have determined repeatedly determined such conduct does not satisfy the "unnecessary and wanton infliction of pain" standard under the Eighth Amendment.  *See, e.g.*, *Blueford v. Prunty*, 108 F.3d 251, 256 (9th Cir. 1997) (affirming summary adjudication in favor of the prison officials where "the only arguably sexually harassing conduct… was verbal"); *Morales v. Mackalm*, 278 F.3d 126, 132 (2d Cir. 2002) (allegations that prison guard asked prisoner to have sex with her and to masturbate in front of her and other female staffers did not rise to level of Eighth Amendment violation); *Barney v. Pulsipher*, 143 F.3d 1299, 1311 n. 11 (10th Cir. 1998) (allegations that a county jailer subjected female prisoners to severe verbal sexual harassment and intimidation was not sufficient to state a claim under the Eighth Amendment); *Zander v. McGinnis*, 1998 U.S. App. LEXIS 13533, 1998 WL 384625, at *2 (6th Cir. June 19, 1998) (finding a prisoner's claim that a guard called him "pet names" for ten months failed to support an Eighth Amendment claim "because allegations of verbal abuse do not rise to the level of a constitutional violation").

---

[7] In the reply brief, Plaintiffs appear to cast the factual allegations as supporting a claim for right to privacy, citing the instances in which Plaintiffs' had "their sex organs… intentionally exposed to male guards and other prisoners."  (Doc. 34 at 19)  However, the "right to privacy" theory of liability is not present in the First Amended Complaint, which focuses only upon harassment and abuse.

///

## 2. Discussion and Analysis

Defendants assert the factual allegations do not support claims against the defendants. (Doc. 30-1 at 22-23  Defendants acknowledge that "Rojas and Lara alleged that Defendants Trevino and Reynolds verbally compared the sizes of their genitalia, causing them to fear sexual abuse." (*Id.* at 22)  Defendants argue, "While such an allegation is vulgar, it does not state an Eighth Amendment violation." (*Id.*, citing *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (holding vulgar language does not state a constitutional deprivation under Section 1983)).  In addition, Defendants contend Medina is unable to state a claim for sexual abuse "because the amended complaint only contains allegations that Plaintiff was 'verbally harassed' by Defendant Dalie." (*Id.* at 22)  Therefore, Defendants request dismissal of the third claim for relief.

In response, Plaintiffs argue that they "claim far more than the errant comment." (Doc. 34 at 19)  According to Plaintiffs, "the use of degrading epithets for prisoners in women's prison is pervasive and that the administration knows this and does nothing to correct the behavior of corrections staff." (*Id.*, citing Doc. 24, ¶¶ 3-6)  In addition, Plaintiffs note the following allegations are presented in the amended complaint:

> Plaintiff Lara alleges that Officer Herrera stepped on her breast while she was being assaulted.[8] (FAC at ¶ 51.) Plaintiffs Lara, Ayestas and Medina allege that during their assaults and after, their sex organs were intentionally exposed to male guards and other prisoners. (FAC at ¶¶ 55, 66-69, 78, 123-128.) Plaintiffs Rojas and Lara allege that officers Trevino and Reynolds made sexually graphic comments following their assaults, while Lara's breast was exposed. (FAC at ¶¶ 78-79.) Plaintiff Medina alleges that Lieutenant Tegtmeyer made sexually explicit threats to him following his assault, while his genitals were exposed. (FAC at ¶¶ 131, 137.)

(Doc. 34 at 19)  Plaintiffs maintain, "[t]here is no penological justification for a pervasive sexual harassment, targeting of sex organs during assaults, exposure of sex organs, and threats and taunts implying sexual abuse." (*Id.*)

### a. Claim by Rojas

Rojas alleges that when outside with Lara, Officers Trevino and Reynolds "verbally compared

---

[8] Plaintiffs actually allege, "Sergeant Collier stepped on her exposed breast," not Officer Herrera. (Doc. 24, ¶ 51)

the sizes of their genitalia," which caused Rojas to fear sexual abuse. (Doc. 24 at 12, ¶ 79) This is the sole allegation addressing sexual abuse or harassment towards Rojas in the First Amended Complaint. However, as discussed above, Eighth Amendment protections "do not necessarily extend to mere *verbal* sexual harassment." *Austin*, 367 F.3d at 1171; *Minifield*, 298 F. Supp. 2d at 903-04 ("Allegations of verbal harassment and abuse fail to state a claim cognizable under 42 U.S.C. § 1983"). Because Rojas has alleged only verbal harassment by Officers Trevino and Reynolds, Rojas fails to state a claim for sexual harassment in violation of the Eighth Amendment. Therefore, the Court recommends the third claim for relief, to the extent it is brought by Rojas, be DISMISSED with leave to amend.

### b. Claim by Lara

Plaintiffs allege that Lara was subjected to the same comments as Rojas by Officers Trevino and Reynolds. (*See* Doc. 24 at 12, ¶ 79) In addition, Plaintiffs assert that Lara's breast was exposed on at least two occasions: (1) when Officer Herrera applied pressure to Lara's back while she was on the ground, and (2) when her muumuu fell as she and Rojas were outside with Officers Trevino and Reynolds. (Doc. 24, ¶¶ 50-51, 78)

Importantly, "the Supreme Court has not recognized that an interest in shielding one's naked body from public view should be protected under the rubric of the right of privacy . . . ." *See Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir. 1985). Although the Ninth Circuit determined "a prisoner[] [has] limited right to bodily privacy," such a claim "calls for a highly factual inquiry." *See Hydrick v. Hunter*, 500 F.3d 978, 1000 (9th Cir. 2007); *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988). Factors the Court has considered include: "the gender of those prison officials who viewed inmates, the angle and duration of viewing, and the steps the prison had taken to minimize invasions of privacy." *Id.*, citing *Grummett*, 779 F.2d at 494-95.

For example, in *Grummett*, the Court considered a claim by male inmates that their right to privacy was violated by female officers viewing them while dressing, showering, being strip searched, or using the toilet. *Id.*, 779 F.2d at 492. The Ninth Circuit assumed "the interest in not being viewed naked by members of the opposite sex is protected by the right of privacy." *Id.*, 779 F.2d at 494. The Court discussed the circumstances in which female officers were observing male inmates, noting:

> Female guards are not assigned to positions requiring unrestricted and frequent surveillance. Rather, the positions to which they are assigned require infrequent and casual observation, or observation at a distance. Female guards working the tiers walk past the cells routinely, but do not stop for prolonged inspection. When they are not walking down the tiers, their view of the inmates in their cells is circumscribed by the cell bars and by the distance and angle of their stations. Likewise, the observations by the female correctional officers stationed on the gunrails overlooking the tiers and the yard areas are obscured by the angle and distance of their locations. Female guards do not accompany male inmates to the individual or gang showers, and are not stationed on the tiers where the showers are located. Females are assigned to the more distant gunrail position overlooking showers, where, again, the surveillance is obscured.

*Id.* at 494-95. The Ninth Circuit concluded that these circumstances were not "so degrading as to require intervention by [the] court," and there was no constitutional violation. *Id.* at 495. Likewise, the Court found there was no constitutional violation because the female guards' viewing of unclothed inmates was "infrequent and irregular," and the guards were not "stationed at those positions which involve close and prolonged surveillance of disrobed inmates." *Id.*

In *Michenfelder v. Sumner*, 860 F.2d 328 (1988), the Ninth Circuit also addressed a claim of a male inmate challenging the stationing of female officers on shower duty and involvement in strip searches as a violation of his right to privacy. *Id.* at 333-34. The Court indicated "the issue … is whether [the prison's] female officers regularly or frequently observe unclothed inmates without a legitimate reason for doing so." *Id.* at 334. The Ninth Circuit found that a division of responsibilities between male and female guards was a reasonable attempt to accommodate the tension between inmates' privacy concerns and the prison's internal security needs and equal employment concerns. *Id.* In addition, the Court found the right to privacy was not violated due to the limited nature of the guards' involvement in the searches, because the evidence showed observations were made from video monitors that provided "an indistinct, limited view." *Id.* The Court found "[e]vidence of female officers' role in shower duty likewise did not establish an inappropriate amount of contact with disrobed prisoners." *Id.* Accordingly, the Court concluded Michenfelder failed to establish violations of his Fourth and Eighth Amendment rights. *Id.* at 338.

Further, in *Somers v. Thurman*, 109 F.3d 614 (9th Cir. 1997), the Ninth Circuit considered an male inmate's claim that his constitutional rights under the Fourth Amendment were violated by female officers conducting visual body cavity searches on a regular basis and watching him shower. *Id.* at 616. Somers also asserted the prison officials "'pointed at him' and 'joked among themselves'

32

during the searches and during his showers, behavior he characterize[d] as 'gawking.'" *Id.* In evaluating whether to apply the doctrine of qualified immunity, the Court reviewed its decisions in *Grummett, Michenfelder,* and *Sepulveda. See Somers*, 109 F.3d at 619-20. The Court observed it never "held that guards of the opposite sex are forbidden from viewing showering inmates." *Id.* at 620. The Court continued: "Taken together, however, one might read *Grummett, Michenfelder*, and *Sepulveda* to suggest that up close, frequent, and intentional viewings by guards of the opposite sex could violate a prisoner's privacy rights." *Id.* The Court found it significant that the actions alleged by Somers "did not involve any physical conduct," and concluded "gawking, pointing, and joking" did not violate the Eighth Amendment. *Id.* at 624.

With these cases in mind, the facts alleged to support a claim by Lara are not sufficient to support a claim for sexual abuse or harassment in violation of constitutional standards. While Plaintiffs assert in the reply brief that her "sex organs were intentionally exposed to male guards and other prisoners" (Doc. 34 at 19), the facts alleged do not support a conclusion that the exposure was intentional by any of the *defendants*. Instead, it appears the exposure was caused first by Officer Herrera when he "slammed…. Lara on the ground" to place her in handcuffs, and then due to the muumuu being too large, which was provided by Officer Guinn, who is not a defendant. (*See* Doc. 24, ¶¶ 51, 57-58) Although Lara was subjected to a strip search by Officer Guinn in the view of Officer Herrera, this single search is not sufficient to support a claim under the Eighth Amendment. *See Michenfelder*, 860 F.2d at 333-34 (finding a male inmate failed to state a claim where he challenged female officers' duty and involvement in strip searches as a violation of his right to privacy); *Grummett*, 779 F.2d at 495 ("infrequent and irregular" viewing of prisoners of the opposite sex by guards was not sufficient to support a claim).

For example, in *Morris v. Newland*, this Court considered the claim of an inmate plaintiff that officers violated his constitutional rights because female guards "made sure to observe plaintiff at length in the shower and in his cell." *Id.*, 2007 WL 707525 at *1 (E.D. Cal. Mar. 6, 2007). The defendants moved to dismiss, asserting the plaintiff failed to state a claim. *Id.* at *2. The Court noted Ninth Circuit authority "implicate[d] circumstances more severe than those set forth… with respect to plaintiff's cross-gender viewing claims." *Id.* at *4. For example, the Court noted that in *Somers*, the

Ninth Circuit found the plaintiff failed to state a constitutional violation "even where the female officials had engaged in 'gawking' at the plaintiff and had pointed at him in the shower 'and joked among themselves.'" *Id.*, citing *Somers*, 109 F.3d at 622. In light of this, the Court found "the[] intentional observation of [the plaintiff] in the shower and in his housing unit in various states of undress" failed to rise to the level of a violation of the Fourth and Eighth Amendments. *Id.* at *5, *adopted by* 2007 WL 987846 (E.D. Cal. Mar. 30, 2007). Likewise, here, it appears that Lara believes officers intentionally viewed in a state of undress. (*See* Doc. 34 at 19). Nevertheless, as this Court determined in *Morris*, the circumstances do not rise to an unconstitutional level.

Because, the facts alleged are not sufficient to support Lara's claim for unconstitutional sexual abuse or harassment, and the Court recommends the third claim for relief, to the extent it is brought by Lara, be **DISMISSED** with leave to amend.

### c. Claim by Ayestas

Plaintiffs fail to identify any instances of sexual abuse or harassment by the defendants that was directed toward Ayestas, although she too brings a claim under the third cause of action. (*See* Doc. 24 at 22) The Court cannot speculate as to the unconstitutional conduct, because Ayestas has a burden to identify a specific injury and show a causal relationship between the defendants' conduct and that injury. *See Rizzo*, 423 U.S. at 371-72.

Given the lack of factual allegations to support a claim by Ayestas, the Court recommends the third cause of action, to the extent it is raised by Ayestas, be **DISMISSED** with leave to amend.

### d. Claim by Medina

Plaintiffs allege that Medina had his genitals exposed during a pat down by Officer Mendoza (a female guard), who is not a defendant in this action. (*See* Doc. 24 at 17, ¶ 123) Specifically, Plaintiffs allege that during the pat down, "Officer Mendoza loosened the strong on [Mendoza's] sweat pants, which caused his pants to fall and exposed his genitals." (*Id.*) Medina reports that after the pat down, he was escorted outside by unspecified officers, while he was "in a tank top with his pants down." (*Id.*, ¶ 124) In addition, Plaintiffs assert that his genitals remained exposed when Medina was placed in a wheelchair and through the time he was placed in a cell in the Unit A Program office. (*Id.* at 18, ¶¶ 130-131) According to Plaintiffs, "About 30 minutes into his confinement, Lieutenant Tegtmeyer came

to [the] cell and began making sexual comments to Medina." (Doc. 24 at 18, ¶ 137)

Importantly, again, it appears the Eighth Amendment claim by Medina is based primarily upon verbal comments, though some assert his genitals were exposed. However, to the extent Medina believes he suffered an unconstitutional violation, he has not identified what specific actions he believes arise to the level of an Eighth Amendment violation. The Court declines to speculate regarding which specific actions Medina believes violated his rights, or which defendants he seeks to state a claim against. *See Rizzo*, 423 U.S. at 371-72. Accordingly, the Court recommends Medina's claim for sexual abuse in violation of the Eighth Amendment be **DISMISSED** with leave to amend.

**F.    Fourth Claim for Relief: Retaliation**

The claim for retaliation in violation of the First Amendment is brought "[b]y plaintiffs against defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino, Officer Dalie, Sergeant Rubalcava, Officer Valencia, Officer Del Toro, in their individual and official capacities." (Doc. 24 at 23, emphasis omitted) According to Plaintiffs, the defendants, "motivated by plaintiffs' protected activity, retaliated against plaintiffs who were engaged in an effort to access the courts, an act protected under the First Amendment, by assaulting plaintiffs and restricting their access to grievances, thus chilling the plaintiffs' protected speech." (Doc. 24 at 23, ¶170)

1.    First Amendment legal standards

Under the First Amendment, prison officials may not retaliate against prisoners for initiating litigation or filing administrative grievances. *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005). A cognizable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) the inmate's protected conduct and that the adverse action (4) chilled the inmate's exercise of his First Amendment rights and (5) did not reasonably advance a legitimate penological purpose. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) (quoting *Rhodes*, 408 F.3d at 567-68).

A "plaintiff must plead facts which suggest that retaliation for the exercise of protected conduct was the 'substantial' or 'motivating' factor behind the defendant's conduct." *Harpool v. Beyer*, Case No. 2012 WL 4038444 at *11 (E.D. Cal. 2012) (referring to *Soranno's Gasco, Inc., v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989). In addition, an adverse action is one that "would chill or silence a

35

person of ordinary firmness from future First Amendment activities." *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (quoting *Mendocino Envtl. Center v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999)).

### 2. Claims of Lara and Ayestas

As an initial matter, the Court notes plaintiffs Lara and Ayestas do not identify any actions they took that would be protected by the First Amendment that motivated Defendants.[9]  Instead, Plaintiffs allege the search and subsequent interactions with officers by Lara and Ayestas were related to Rojas' requests to speak to the Investigative Services Unit[10] regarding verbal abuse by Officer Herrera and during the cell search lead by Officer Collier.  (*See* Doc. 24 at 8, ¶¶ 30-31, 37)  Even opposing dismissal of the claim, Plaintiffs do not identify any constitutionally-protected activities by Lara and Ayestas, and instead identify only actions by Rojas and Medina.  (*See* Doc. 34 at 21-22)

Because Lara and Ayestas do not allege any facts supporting a conclusion that the defendants took adverse actions because of protected conduct by Lara and Ayestas, they fail to state claims for retaliation in violation of the First Amendment. *See Brodheim*, 584 F.3d at 1269.

### 3. Claim of Rojas

Plaintiffs contend that Rojas engaged in protected conduct by "ask[ing] to speak to ISU to report harassment."  (*See* Doc. 34 at 22)  Importantly, however, Plaintiffs have not identified any facts supporting a conclusion that speaking to ISU was an activity protected by the First Amendment. Moreover, the Court has not located any authority extending constitutional protection to the right to speak with an ISU officer.  Thus, the Court finds Rojas has failed to identify protected conduct that motivated the defendants' conduct.

### 4. Claim of Medina

According to Plaintiffs, "When Medina asked another officer to intervene in the harassing behavior of officer Dalie, he engaged in protected activity."  (Doc. 34 at 22)  However, the Court has

---

[9] Plaintiffs allege that *after* the actions that form the basis for this complaint, Lara and Ayestas requested grievance forms "were continually denied access to the forms."  (Doc. 24, ¶¶ 94-95)  It is not clear who denied the forms. Regardless, the form requests by Lara and Ayestas clearly could not have motivated the actions already taken by Defendants.

[10] The Court is aware of no right of prisoners to speak to ISU officers, and the plaintiffs have failed to cite to any authority for this proposition.  Rather the California Code of Regulations allows the inmate to grieve conditions by submitting a written complaint. CCR § 3084.1.

not located any legal authority extending constitutional protection to an inmate's verbal request for help or intervention.

Even assuming the request for another officer to intervene was constitutionally-protected, Plaintiffs fail to allege facts sufficient to support a conclusion that an adverse action by the named defendants was motivated by the request from Medina. Indeed, the facts clearly indicate the actions of Officer Dalie started *before* the request. According to Plaintiffs, "Officer Dalie accused [Medina] of lying about his medical needs" on January 4, 2017. (Doc. 24 at 15, ¶ 102) The next day, "Officer Dalie again scrutinized Medina's medication needs." (*Id.*, ¶ 103) Plaintiffs allege: "After opening Medina's cell door, Officer Dalie stood in the doorway and physically intimidated Medina." (*Id.*, ¶ 104) Once Medina left his cell, "Officer Dalie trailed Medina and verbally harassed him." (*Id.*, ¶ 106) The harassment escalated after Medina asked Dalie to stop and then "asked another guard in the Unit to ask Officer Dalie to stop." (*Id.*, ¶ 108) Thus, Officer Dalie's harassment of Medina began before the alleged constitutionally protected activity, and Medina fails to allege facts that establish a causal link. Further, there are no facts alleged that the officers who responded to Dalie's code were aware of the statement made by Medina, and as a result they could not be motivated by Medina's request.

### 5. Conclusion

The facts alleged do not support a cognizable claim for retaliation in violation of the First Amendment by any of the named defendants against Plaintiffs. Accordingly, the Court recommends the fourth claim for relief be **DISMISSED** with leave to amend.

**G. Fifth Claim for Relief: Failure to Adequately Hire, Train, Supervise, and Discipline**

The final claim for relief is brought "[b]y all plaintiffs against defendants Kernan and Espinoza in their official capacities, and defendants Adams and Johnson in their individual capacities." (Doc. 24 at 23, emphasis omitted) Defendants argue the fifth claim for relief should be dismissed, because Plaintiffs "fail[] to allege any specific conduct on the part of any individual supervisory Defendant." (Doc. 30-1 at 18)

### 1. Supervisor liability under Section 1983

Under Section 1983, Plaintiffs must demonstrate that each defendant *personally* participated in the deprivation of their rights. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir.2002) (emphasis added).

Thus, liability may not be imposed on supervisory personnel under Section 1983 on the theory of *respondeat superior*, as each defendant is only liable for his or her own misconduct. *Iqbal*, 129 S.Ct. at 1948-49(2010); *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009). A supervisor may be held liable only if he or she "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); accord *Starr v. Baca*, 633 F.3d 1191 (9th Cir. 2011); *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009); *Preschooler II v. Clark County School Board of Trustees*, 479 F.3d 1175, 1182 (9th Cir. 2007); *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997).

A supervisor's failure to train subordinates may give rise to individual liability under Section 1983 where the failure amounts to deliberate indifference to the rights of persons with whom the subordinates are likely to come into contact. *See Canell v. Lightner*, 143 F.3d 1210, 1213-14 (9th Cir. 1998). To impose liability under this theory, a plaintiff must demonstrate the subordinate's training was inadequate, the inadequate training was a deliberate choice on the part of the supervisor, and the inadequate training caused a constitutional violation. *Id.* at 1214; *see also City of Canton v. Harris*, 489 U.S. 378, 391 (1989); *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).

2.    Analysis

In the First Amended Complaint, Plaintiffs allege: "defendants Kernan, Espinoza, Adams and Johnson are required to train corrections officers and implement policies that protect the constitutional rights of prisoners, and discipline officers who violate such rights." (Doc. 24 at 23, ¶ 172)  According to Plaintiffs,

> [D]efendants Kernan, Espinoza, Adams and Johnson failed in their obligation to adequately train their corrections officers to refrain from subjecting prisoners to excessive force and sexual abuse and harassment, violations of plaintiffs' constitutional rights, in their obligation to have in place policies that protect the constitutional rights of prisoner, and in their obligation to discipline officers who violate the constitutional rights of prisoners.

(*Id.* at 23-24, ¶ 173) (emphasis omitted)  Plaintiffs contend that due to these actions—or inaction— "defendants Adams and Johnson were and defendants Kernan and Espinoza remain deliberately indifferent to the obvious consequences of their failure to adequately hire, train, supervise, and discipline corrections officers who engage in these constitutional violations."  (*Id.*) (emphasis omitted)

///

### a. Claim against Governor Edmund Brown

Plaintiffs acknowledge they "removed all allegations against … Brown" in the First Amended Complaint.  (Doc. 34 at 22, n. 4)  However, Edmund G. Brown, Jr. remains identified as a defendant on the Court's docket.  Therefore, the Court recommends Edmund G. Brown, Jr. be **DISMISSED** without leave to amend and the Clerk of Court be directed to update the docket.

### b. Claim against Kernan and Espinoza

In a case based on an ongoing violation of federal constitutional or statutory rights, a plaintiff may obtain prospective injunctive relief by naming a state official in his or her official capacity. *Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997) ("When sued for prospective injunctive relief, a state official in his official capacity is considered a 'person' for § 1983 purposes.").

Plaintiffs seek to state claims against Scott Kernan, the Secretary of California Department of Corrections and Rehabilitation, and Janel Espinoza, Acting Warden at CCWF, in their official capacities.  (*See* Doc. 24 at 4-5, ¶¶ 14-15)  According to Plaintiffs, "Kernan is responsible for ensuring that the CDCR complies with all state and federal laws, and that the civil and legal rights of individuals confined by CDCR are upheld."  (*Id.* at 4, ¶ 14)  In addition, Plaintiffs assert that "Espinoza is responsible for ensuring that CCWF complies with all state and federal laws, and that the civil and legal rights of individuals confined at CCWF are upheld."  (*Id.*, ¶ 15)

Plaintiffs assert that Kernan and Espinoza "are required to train corrections officers and implement policies that protect the constitutional rights of prisoners, and discipline officers who violate such rights."  (Doc. 24 at 23, ¶ 172)  They assert the defendants "failed in their obligation to adequately train their corrections officers to refrain from subjecting prisoners to excessive force and sexual abuse and harassment, violations of plaintiffs' constitutional rights, in their obligation to have in place policies that protect the constitutional rights of prisoner, and in their obligation to discipline officers who violate the constitutional rights of prisoners."  (*Id.* at 23-24, ¶ 173)

Significantly, there are no facts alleged supporting assertion that Kernan—as the Secretary of CDCR—has an obligation to *train* the officers that work at CDCR's institutions such as CCWF.

Indeed, such a claim seems dubious. Further, as Defendants contend, Plaintiffs' claims against Kernan and Espinoza fail because they "have not identified a state policy or procedure at issue to state an official capacity suit for injunctive relief against Secretary Kernan or Warden Espinoza." (Doc. 30-1 at 19, citing *Haber v. Melo*, 502 U.S. 21, 25 (1991)). Finally, Plaintiffs have not identified the injunctive relief sought in the First Amended Complaint, such that the Court can determine prospective injunctive relief is a viable and available remedy. Consequently, the Court recommends the claims against Kernan[11] and Espinoza be **DISMISSED** with leave to amend.

### c.   Claim against Wardens Johnson and Adams

Plaintiffs seek to hold former acting wardens Johnson and Adams liable in their individual capacities under Section 1983. (*See* Doc. 24 at 5, ¶¶ 16-17; *id.* at 23) According to Plaintiffs, Johnson was the Acting Warden of CCWF when Plaintiffs Rojas, Ayestas and Lara were injured in 2015. (*Id.* at 5, ¶ 17) They assert Adams "was Acting Warden when Plaintiff Medina was injured" in 2017. (*Id.*, ¶ 16) According to Plaintiffs, as Acting Wardens, Johnson and Adams were "responsible for ensuring that the CCWF complied with all state and federal laws, and that the civil and legal rights of individuals confined at CCWF were upheld." (*Id.*, ¶¶ 16-17) However, Plaintiffs contend Johnson and Adams "failed in their obligation to adequately train their corrections officers to refrain from subjecting prisoners to excessive force and sexual abuse and harassment, violations of plaintiffs' constitutional rights, in their obligation to have in place policies that protect the constitutional rights of prisoner, and in their obligation to discipline officers who violate the constitutional rights of prisoners." (*Id.* at 23-24, ¶ 173)

Importantly, Plaintiffs do not allege facts that show Johnson and Adams were aware of any unconstitutional actions by officers at CCWF. As this Court previously observed, "[t]he cases in which supervisors have been held liable under a failure to train/supervise theory involve conscious choices made with full knowledge that a problem existed." *Woodward v. Kokor*, 2017 WL 2572456 (E.D. Cal. June 13, 2017) (citation omitted); *see also Cousin v. Small*, 325 F.3d 627, 637 (5th Cir.

---

[11] As alleged, it appears that Kernan has little control over the customs in place at the individual prisons. Rather, the plaintiffs seem to assert that it is the wardens that have this control. Thus, at least as it now stands, it appears that Kernan is named purely because he is "where the buck stops" for the CDCR as a whole. If this is the plaintiffs' design, naming Kernan simply attempts to impose respondeat superior liability, which is improper.

2003) (explaining that to impose liability for failure to train, "a plaintiff must usually demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation"). Here, however, there are no facts alleged regarding the knowledge of Johnson and Adams of a pattern of violations by officers at CCWF. Without such knowledge, the Court is unable to find the defendants exhibited deliberate indifference to the civil rights of prisoners at CCWF. *See Canell*, 143 F.3d at 1213-14; *City of Canton v. Harris*, 489 U.S. at 391.

Consequently, the Court finds the facts alleged are not sufficient to support Plaintiffs' claim for failure to train, supervise, and discipline[12] against Johnson and Adams, and recommends the fifth claim for relief be **DISMISSED** with leave to amend.

## V.       Findings and Recommendations

Based upon the foregoing, the Court finds severance of the claims of Rojas, Ayestas, and Lara from the claims of Medina is appropriate. In addition, Plaintiffs have failed to allege sufficient *facts*—rather than legal conclusions—to support their claims for relief challenged by Defendants above. Thus, the Court **RECOMMENDS**:

1. Defendant Brown be **DISMISSED** without leave to amend, and the Clerk of Court be directed to update the Docket;

2. Defendants' motion for misjoinder be **GRANTED**;

3. The Clerk of Court be **DIRECTED** to open a new civil action and docket the First Amended Complaint (Doc. 24) as the operative pleading in that action;

4. The motion to dismiss pursuant to Rule 12(b)(6) be **GRANTED** in this action and in the severed case;

5. The first, second, third, fourth, and fifth claims for relief be **DISMISSED** with leave to amend within 21 days.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local

---

[12] In the First Amended Complaint, Plaintiffs indicate the "Fifth Claim for Relief" is for "Failure to Adequately Hire, Train, Supervise, and Discipline." However, there are no allegations made regarding the *hiring* of the defendant officers. To the extent Plaintiffs intended to state a claim for unlawful hiring practices, the claim fails for a lack of factual support.

Rules of Practice for the United States District Court, Eastern District of California. Within fourteen days after being served with these Findings and Recommendations, any party may file written objections. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to objections shall be filed within seven days of the date of service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991); *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:  __**August 30, 2018**__          _____**/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE