1

2

3

4

5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **EASTERN DISTRICT OF CALIFORNIA**

10

11   STACY ROJAS, et al.,                    )   Case No.: 1:17-cv-01514 - DAD - JLT
                                             )
12               Plaintiffs,                 )   FINDINGS AND RECOMMENDATIONS
                                             )   DISMISSING CERTAIN CLAIMS AND
13        v.                                 )   DEFENDANTS
                                             )
14   EDMUND G. BROWN, JR., et al.,           )
                                             )
15               Defendants.                 )
                                             )
16   _____)

17          While incarcerated at Central California Women's Facility, Stacy Rojas, Ivett Ayestas, and

18   Sarah Lara contend they each were assaulted by employees of the California Department of

19   Corrections and Rehabilitation and suffered violations of their civil rights arising under the First,

20   Eighth, and Fourteenth Amendments.

21   **I.        Screening**

22          In general, the Court screens complaints brought by prisoners seeking relief against a

23   governmental entity or officer or employee of a governmental entity.  *See* 28 U.S.C. § 1915A(a).  The

24   Court must dismiss a complaint or portion thereof if the prisoner raises claims that are legally

25   frivolous, malicious, fail to state a claim upon which relief may be granted, or "seeks monetary relief

26   from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b)(1),(2); *see also* 28 U.S.C. §

27   1915(e)(2)(B)(i)-(iii).

28   *///*

1

## II.    Factual Allegations

Plaintiffs assert they "are all gender non-conforming and/or queer individuals, and are all survivors of sexual trauma and violence." (Doc. 57 at 2, ¶ 2)  Plaintiffs all shared a cell at Central California Women's Facility ("CCWF") in November 2015. (*Id.* at 7, ¶ 30) Plaintiffs allege, "Rojas, Ayestas and Lara were called 'hoe,' (sic) 'bitch,' 'slut' and other degrading and sexually charged epithets by guards on a daily basis due to their perceived gender identity and sexual orientation. Rojas was also referred to as 'it' because they are masculine-presenting." (*Id.* at 6, ¶ 22)

According to Plaintiffs, on November 7, 2015, "Stacy Rojas was performing programming duties near the guard's desk in Unit 510 at CCWF." (Doc. 57 at 6, ¶ 20)  Plaintiffs allege Rojas needed to use the restroom and asked Officer Miguel Herrera to unlock a door, after which Officer Herrera "called Rojas a 'stupid hoe.' (sic)" (*Id.*, ¶ 21)  Plaintiffs allege, "Rojas told Officer Herrera that his and other guards' similar comments … had been documented in recent weeks," and Rojas planned to submit evidence of the abusive comments to the Investigative Services Unit. (*Id.* at 6-7, ¶ 23) Plaintiffs assert Rojas "immediately demanded to speak to the ISU," but "the guards either denied [the request] or neglected to contact ISU." (*Id.* at 7, ¶¶ 24-25)

Plaintiffs assert that on November 11, 2015, a unit and yard was recall was performed around 2 p.m., which directed all prisoners to return to their cells for "a count and dorm check." (Doc. 57 at 7, ¶¶ 26-27)  Plaintiffs allege, "Rojas, Ayestas, and Lara complied with the unit and yard recall and returned to their cell, which was unlocked." (*Id.*, ¶ 28)  Plaintiffs assert that after returning to the cell, "Ayestas asked and received permission from a guard to retrieve her laundry that was in the laundry room, not far from her cell." (*Id.*, ¶ 29)  While Ayestas was away, "Sergeant Jason Collier ordered Rojas, Lara, and their cellmates to exit the cell "and had them stand in the day room while [he] and other unit staff conducted a destructive search of the cell that Rojas, Ayestas, and Lara shared." (*Id.*, ¶30)  According to Plaintiffs, "Collier oversaw the operation"—which was conducted by nine to ten correctional officers—and Collier "made comments to Rojas and Lara that led them to believe that officers were searching for the evidence of officer misconduct to which that Rojas had alluded several days earlier." (*Id.* at 7-8, ¶ 30)

Plaintiffs report Rojas asked Collier to speak to ISU during the search, and the request was

2

denied. (Doc. 57 at 8, ¶ 31) Plaintiffs assert, "In response, Sergeant Collier began shoving Rojas," who was "violently slammed … to the ground" by Collier and other officers, and handcuffed. (*Id.*, ¶34) Plaintiffs allege, "With Rojas incapacitated on the ground and in handcuffs, Sergeant Collier performed what is known as a 'boot-burn' on Rojas's back," explaining a "boot burn" is performed "by stomping forcefully onto a person's back and then dragging one's boot in a grating manner against the skin to create a burning sensation." (*Id.*, ¶ 37) Plaintiffs contend "Collier did this for no other reason than to unjustifiably punish and cause pain to Rojas," in retaliation for the complaints. (*Id.*) Plaintiffs report the boot burn caused "severe bruising and lacerations" on Rojas' back. (*Id.*)

Plaintiffs allege: "As plaintiff Ayestas exited the laundry room, she was commanded to position herself on the ground face down where she was placed in handcuffs by Officer Reynolds." (Doc. 57 at 8, ¶ 35) (emphasis omitted) Plaintiffs assert then "Lara began taking contemporaneous notes of the guards' conduct" during the encounter." (*Id.*, ¶ 36)

According to Plaintiffs, " Officer Reynolds took Rojas and Ayestas to the Program Office and placed them in isolation cages, which are typically used for brief holding and for programming. The cages do not have a seat and do not provide much room to move." (Doc. 57 at 8, ¶ 38) Plaintiffs assert Rojas and Ayestas were placed in separate cages by Officer Trevino. (*Id.* at 9, ¶ 40) Plaintiffs allege Officers Reynolds and Trevino stood outside Rojas' cage, asking if Rojas "thought of themselves as a man" and saying that "they would show Rojas how men work." (*Id.*, ¶ 40) Rojas believed the officers comments were "a threat of violence." (*Id.*)

Plaintiffs allege that "[a]fter Rojas and Ayestas were removed, Lara, still in the Unit, requested a grievance form so that she could lodge a formal complaint. The guard told her that they would not provide access to the grievance form and told her to go sit down." (Doc. 57 at 9, ¶ 41) According to Plaintiffs, Lara insisted upon receiving a form and "Collier responded by yelling at her to 'sit the fuck down.'" (*Id.*, ¶ 42) Plaintiffs allege "Lara was startled by his tone and told him so," and then "Collier grabbed Lara by the wrist and bent it back," directing Herrera to place Lara in handcuffs. (*Id.*, ¶¶ 44-45) Plaintiffs contend Herrera handcuffed Lara after he "slammed … Lara on the ground and applied pressure with his foot or knee to her back." (*Id.*, ¶ 50) Plaintiffs allege:

> While plaintiff Lara lay face down on the ground with Officer Herrera applying
> pressure on her back, Sergeant Collier approached plaintiff Lara's right side, where the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> pressure applied by Officer Herrera had caused her right breast to protrude. Sergeant Collier intentionally stepped on her exposed breast and applied so much pressure that plaintiff Lara was left with visible bruises. Plaintiff Lara cried out in pain, pleading with them that she was complying and imploring them to stop standing on her back and breast. Despite her cries to Sergeant Collier that he was on her breast, Sergeant Collier did not remove his foot or lessen his pressure.

(Doc. 57 at 9, ¶ 45) Plaintiffs assert that Collier then "grabbed [Lara] by the handcuffed arms and yanked upwards, wrenching her shoulders," after which Officers Herrera and Allyson Guinn took Lara to the Program Office. (*Id.* at 10, ¶¶ 46-48)

According to Plaintiffs, once Lara arrived at the Program Office, "she was first forced into the inmate restroom for a strip-search," which was performed by Officer Guinn. (Doc. 57 at 10, ¶¶ 48-49) They allege, "the search was conducted with the door open and in clear view of Officer Herrera, who was able to observe Lara's nude body." (*Id.*, ¶ 49) Plaintiffs contend that during the search, "Officer Guinn located and shredded the notes Lara had taken during the assault on Rojas." (*Id.*, ¶ 50) In addition, Plaintiffs allege "Lara was menstruating at the time and requested the opportunity to change her tampon," which was not permitted. (*Id.*, ¶ 51) Lara's clothes were disposed of, and she received a muumuu to wear from Guinn. (*Id.*) Plaintiffs assert this "muumuu was so large that it slipped off her shoulder" throughout the time she was in isolation, exposing both Lara's breast and "graphic scarring" from domestic violence that she had suffered. (*Id.* at ¶¶ 51-52)

Plaintiffs assert Rojas, Lara, and Ayestas remained in their respective isolation cages for about 12 hours, and "[t]hey were never released for use of the bathroom, medical treatment, or access to food or water." (Doc. 57 at 11, ¶ 56) As a result, "Rojas, Lara, and Ayestas were reduced to soiling themselves when they could no longer hold their urine." (*Id.*, ¶ 58)

Plaintiffs allege Ayestas was taken to the bathroom around 11p.m., but "she remained in full view of Lieutenant Timothy Tegtmeyer, a male officer." (Doc. 57 at 11, ¶ 60) Plaintiffs allege Ayestas "was ordered to undress and put on a muumuu, which would have caused her to expose herself to Lieutenant Tegtmeyer." (*Id.*) According to Plaintiffs, when Ayestas "asked for privacy, Lieutenant Tegtmeyer threatened to put her in Administrative Segregation if she did not undress in front of him." (*Id.*) After Ayestas "insisted that she not be forced to change in view of male officers, Lieutenant Tegtmeyer grabbed her by the shoulders and forced her up against the wall." (*Id.*, ¶ 61) Plaintiffs

allege Collier grabbed Ayestas and slammed her to the floor, and Ayestas "hit her face on the toilet when she fell." (*Id.*) Plaintiffs assert that once Ayestas was on the ground, Collier pinned her down with his knee, "Tegtmeyer held her legs," "Collier held her arms," and the two prison officials "proceeded to cut off Ayestas' clothing" with scissors retrieved by Trevino. (*Id.* at 11-12, ¶¶ 61-62)

Plaintiffs assert Lara and Rojas could hear the commotion and screaming from Ayestas, and Rojas attempted hanging with a shoelace. (Doc. 57 at 12, ¶¶ 65-66) They report Lara witnessed the suicide attempt, and "began banging loudly on her cage and screaming that Rojas was trying to hang… [but] officers in the restroom did not respond to her cries for help." (*Id.*, ¶ 67) Instead, the response came from an officer "who happened to be passing through the Program Office at the time." (*Id.*, ¶ 68) The officer opened Rojas' cage, and unidentified officers took away Rojas' socks and shoes, dressing "Rojas in a thin smock and a pair of pants, with no layers, underwear, or bra underneath." (*Id.*, ¶ 69) Rojas did not receive medical care, and was returned to the cell, handcuffed. (*Id.*, ¶¶ 69-70)

According to Plaintiffs, "After several hours, Officers Trevino and Reynolds took Rojas and Lara outside in temperatures below 50 degrees Fahrenheit. Rojas was still wearing the single layer of clothing, wet from having soiled themselves, and no socks or shoes. Lara was clad only in a muumuu, a pair of socks, and sneakers." (Doc. 57 at 12, ¶ 71) Both Rojas and Lara were handcuffed, and because Lara's muumuu kept falling, she asked Rojas to pull it up using teeth. (*Id.* at 13, ¶ 72) In addition, Plaintiffs assert: "Officers Trevino and Reynolds stood with Rojas and Lara and sexually harassed them. The officers verbally compared the sizes of their genitalia, causing plaintiffs Rojas and Lara to fear further sexual abuse." (*Id.*, ¶ 73) "After 30 to 60 minutes, Rojas and Lara were returned to the cages." (*Id.*, ¶ 74)

Plaintiffs assert that around 2 a.m., Rojas and Lara were released to Administrative Segregation staff and taken to the prison's Crisis Center," where the handcuffs were removed. (Doc. 57 at 13, ¶ 75) Ayestas was already at the Crisis Center, and Plaintiffs report that after all three were processed, they were "placed in Administrative Segregation for about 12 hours." (*Id.*, ¶¶ 75-76)

Plaintiffs allege, "Rojas, Ayestas, and Lara had visible marks from the officers' abuse." (Doc. 57 at 13, ¶ 77) In particular, Plaintiffs assert that "Rojas had bruising and serious skin lesions… from the boot burn," and "requests for medical attention were ignored." (*Id.*, ¶¶ 78-79) Plaintiffs allege that

"Lara's wrists were visibly injured, … her right breast was clearly bruised," and "[s]he suffered other bruising and pain from the force with which she hit the ground." (*Id.*, ¶ 80) Lara contends she "has lasting pain in her wrists, and her hip regularly locks up, causing her pain." (*Id.*) Further, Plaintiffs allege: "Ayestas had a black eye from her face hitting the toilet. She had bruises and injury to her back and shoulder from having a knee and the full weight of an officer pressed into her back and having her arm twisted as she was slammed into a wall. She still experiences chronic pain in her back and shoulder from the assault." (*Id.*, ¶ 81) Finally, Plaintiffs contend they each "had severe emotional reactions to the trauma and harassment." (*Id.* at 14, ¶ 82)

Plaintiffs assert that "Rojas, Ayestas, and Lara began asking for a CDCR form 602 to file a grievance about their abuse, treatment, and segregation" once they were placed in Administrative Segregation. (Doc. 57 at 14, ¶ 88) However, the requested forms were repeatedly denied. (*Id.*, ¶ 89) Plaintiffs allege eventually they filed grievances, but they were "constantly lost or discarded" by guards. (*Id.*, ¶ 90) Ayestas' grievance resulted in an investigation, but she never learned the outcome and "the involved guards were never disciplined." (*Id.* at 14-15, ¶¶ 90, 92)

### III. Procedural History

Stacy Rojas, Ivette Ayestas, Sara Lara, and Claudia ("Isaac") Medina initiated this action by filing a complaint for violations of their civil rights under 42 U.S.C. § 1983 and the Americans with Disabilities Act on November 9, 2017. (Doc. 1) The Court issued summons as to all defendants on November 13, 2017. (Docs. 2-5)

On April 23, 2018, the Court ordered Plaintiffs to show cause why the complaint should not be dismissed to the extent defendants were sued in their official capacities, observing "states cannot be sued in federal court for violating § 1983" and the Eleventh Amendment, "in general, bars suits for damages against state officials in their official capacities because, in effect, this is a claim against the entity." (Doc. 23 at 2, citing *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985)) Further, the Court directed Plaintiffs to show cause why their claim for violations of the Americans with Disabilities Act should not be dismissed because "liability under Title II of ADA may not be imposed on individuals." (*Id.*, citing *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002). In the alternative, Plaintiffs were directed to file an amended complaint that addressed these deficiencies. (*Id.* at 3)

The plaintiffs—including Medina— filed a First Amended Complaint on May 1, 2018. (Doc. 24) Plaintiffs asserted their rights arising under the First and Eighth Amendments to the United States Constitution have been violated. (*See id.* at 3, ¶ 7) Defendants filed a motion to dismiss and sever the claims of Medina from those of Rojas, Lara, and Ayestas due to misjoinder. (Doc. 30)

The Court granted Defendants' motion for misjoinder, and the claims of Medina were severed from this action on May 15, 2019. (Doc. 53 at 6) In addition, the Court granted the motion to dismiss in part, denying the motion as to Rojas' claim for retaliation and granting dismissal with leave to amend on all other challenged causes of action. (*Id.*) Plaintiffs filed their Second Amended Complaint on April 4, 2019 (Doc. 57)

## IV.     Pleading Standards

General rules for pleading complaints are governed by the Federal Rules of Civil Procedure. A pleading must include a statement affirming the court's jurisdiction, "a short and plain statement of the claim showing the pleader is entitled to relief; and . . . a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a).

A complaint must give fair notice and state the elements of the plaintiff's claim in a plain and succinct manner. *Jones v. Cmty. Redevelopment Agency*, 733 F.2d 646, 649 (9th Cir. 1984). The purpose of the complaint is to inform the defendant of the grounds upon which the complaint stands. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). The Supreme Court noted,

> Rule 8 does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (internal quotation marks and citations omitted). Vague and conclusory allegations do not support a cause of action. *Ivey v. Board of Regents*, 673 F.2d 266, 268 (9th Cir. 1982). The Court clarified further,

> [A] complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [Citation]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. [Citation]. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. [Citation]. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'

7

*Iqbal*, 556 U.S. at 679 (citations omitted).  When factual allegations are well-pled, a court should assume their truth and determine whether the facts would make the plaintiff entitled to relief; legal conclusions are not entitled to the same assumption of truth.  *Id.*  The Court may grant leave to amend a complaint to the extent deficiencies of the complaint can be cured by an amendment.  *Lopez v. Smith*, 203 F.3d 1122, 1127-28 (9th Cir. 2000) (en banc).

**V.      Section 1983 Claims**

An individual may bring an action for the deprivation of civil rights pursuant to 42 U.S.C. § 1983 ("Section 1983"), which "is a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must allege a specific injury was suffered and show causal relationship between the defendant's conduct and the injury suffered.  *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976).  A person deprives another of a right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

**VI.      Discussion and Analysis**

Plaintiffs raise the following causes of action in their Second Amended Complaint: (1) excessive force in violation of the Eighth Amendment; (2) sexual abuse and harassment in violation of the Eighth Amendment; (3) retaliation in violation of the First Amendment; and (4) failure to adequately hire, train, supervise, and discipline correction officers. (Doc. 57 at 17-20)

**A.      First Claim for Relief: Excessive Force**

Plaintiffs indicate this claim is raised "[b]y all plaintiffs against defendants Lieutenant

Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino in their individual and official capacities." (Doc. 57 at 17) Plaintiffs allege these defendants, "while under color of law, used excessive and unnecessary force and in doing so acted maliciously and sadistically for the purpose of causing harm to plaintiffs, in violation of their right under the Eight Amendment of the United States Constitution to be free from cruel and unusual punishment." (*Id.* at 17, ¶ 112)

### 1. Excessive Force under the Eighth Amendment

The Eighth Amendment protects inmates from inhumane methods of punishment and conditions of confinement. *See Farmer v. Brennan*, 511 U.S. 825 (1994); *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). One of the "basic human needs" that prison officials must provide is personal safety, and prison officials have a duty to take reasonable steps to protect inmates from physical harm. *Hoptowit v. Ray*, 682 F.2d 1237, 1247, 1250-51 (9th Cir. 1982). To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

"Whether a particular event or condition in fact constitutes 'cruel and unusual punishment' is gauged against 'the evolving standards of decency that mark the progress of a maturing society.'" *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). However, the Supreme Court has determined that "when prison officials maliciously and sadistically use force to cause harm contemporary standards of decency are always violated." *Id.* (citing *Hudson*, 503 U.S. at 9). In such circumstances, "the only requirement is that the officer's actions be 'offensive to human dignity,'" and a physical injury is not necessary to establish a claim. *Id.* (quoting *Felix v. McCarthy*, 939 F.2d 699, 702 (9th Cir. 1991)).

The Supreme Court determined that "[n]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins v. Gaddy*, 130 S.Ct. 1175, 1178 (2010) (quoting *Hudson*, 503 U.S. at 9). Factors that can be considered are "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." *Whitley v. Albers*, 475 U.S. 312, 321 (1986); *Marquez v. Gutierrez*, 322 F.3d 689, 692 (9th Cir. 2003). In addition, the Court may consider "the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7 (internal quotation marks omitted)

Although the extent of an injury is relevant, the inmate does not need to sustain serious injury.  *Id.*; *Wilkins*, 130 S. Ct. at 1178-79.  The prohibition on cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force. *Hudson*, 503 U.S. at 9-10.

### 2.   Claim by Rojas

As noted above, the claim for excessive force is is brought by all plaintiffs against Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, Officer Trevino.  (Doc. 57 at 17)

According to Plaintiffs, during the cell search, "Sergeant Collier began shoving Rojas," who was "violently slammed … to the ground" (Doc. 57 at 8, ¶34) In addition, Plaintiffs allege Collier performed "boot burn on Rojas' back," which is done "by stomping forcefully onto a person's back and then dragging one's boot in a grating manner against the skin to create a burning sensation."  (*Id.*, ¶ 37, internal quotation marks omitted)  There is no indication that the application of force or the amount of force used by Collier was necessary.  Therefore, the facts alleged state a claim by Rojas against Collier.

The facts alleged do not indicate that Tegtmeyer, Herrera, Reynolds, or Trevino used any form of force against Rojas.  Plaintiffs alleged Rojas was slammed to the ground  by "Collier *and other unknown officers*," (Doc. 57 at 8, ¶34) (emphasis added)  The facts do not support an inference that these unidentified officers were the named defendants.  There is no indication in the pleadings that Tegtmeyer was present or interacted with Rojas at any time.  Thus, Rojas fails to state a cognizable claim for excessive force by Tegtmeyer, Herrera, Reynolds, or Trevino; and the Court recommends the first cause of action— to the extent it is brought by Rojas against Tegtmeyer, Herrera, Reynolds, and Trevino— be **DISMISSED** without leave to amend.

### 3.   Claim by Lara

Plaintiffs allege force was used against Lara both during the cell search and later in a bathroom after her removal to the Program Office.  (*See* Doc. 57 at ¶¶ 42-50, 60-62)  Specifically, Plaintiffs allege that after Lara insisted upon receiving a grievance form so that she could lodge a formal complaint regarding the cell search and officers' conduct, "Collier grabbed Lara by the wrist and bent it back."  (*Id.*, ¶¶ 44-45)  Plaintiffs assert Herrera handcuffed Lara after he "slammed … Lara on the ground and applied pressure with his foot or knee to her back."  (*Id.*, ¶ 50)  Plaintiffs allege:

> While plaintiff Lara lay face down on the ground with Officer Herrera applying
> pressure on her back, Sergeant Collier approached plaintiff Lara's right side, where the

pressure applied by Officer Herrera had caused her right breast to protrude. Sergeant Collier intentionally stepped on her exposed breast and applied so much pressure that plaintiff Lara was left with visible bruises. Plaintiff Lara cried out in pain, pleading with them that she was complying and imploring them to stop standing on her back and breast. Despite her cries to Sergeant Collier that he was on her breast, Sergeant Collier did not remove his foot or lessen his pressure.

(*Id.*, ¶45)  Plaintiffs assert Collier then "grabbed [Lara] by the handcuffed arms and yanked upwards, wrenching her shoulders," after which Lara was taken to the Program Office.  (*Id.* at 10, ¶¶ 46-48)

From the facts alleged, it appears Lara did not comply with Collier's command to sit down, and she was resisting the officer.  *See Nelson v. City of Davis,* 685 F.3d 867, 881 (9th Cir. 2012) (observing resistance "runs the gamut from purely passive [individual] who simply refuses to stand, to the individual who is physically assaulting the officer").  Nevertheless, it does not appear Collier or Herrera perceived a threat when Lara was "slammed" the ground.  In addition, Plaintiffs allege Lara "was complying" with the officers when Collier stepped on her breast.  These factors support a conclusion that Collier and Herrera used excessive force upon Lara.  *See Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321.

Lara fails to identify any use of force against her by Tegtmeyer, Reynolds, or Trevino.  There are no facts supporting a conclusion that these defendants touched her at any time, and it appears that Tegtmeyer never interacted with Lara during the underlying incidents.  Consequently, Lara fails to state a claim against these defendants, and the Court recommends the first cause of action— to the extent it is brought by Lara against Tegtmeyer, Reynolds, and Trevino— be **DISMISSED** without leave to amend.

### 4.     Claim by Ayestas

Plaintiffs allege that when Ayestas exited the laundry room during the cell search, "she was commanded to position herself on the ground face down where she was placed in handcuffs by Officer Reynolds."  (Doc. 57 at 8, ¶ 35) (emphasis omitted)  Once she was taken to the Program Office, she was taken to the bathroom around 11 p.m., at which time Plaintiffs allege "Ayestas "was ordered to undress and put on a muumuu, which would have caused her to expose herself to Lieutenant Tegtmeyer."  (*Id.* at 11, ¶ 60)  According to Plaintiffs, when Ayestas "asked for privacy, Lieutenant Tegtmeyer threatened to put her in Administrative Segregation if she did not undress in front of him."

(*Id.*) After Ayestas "insisted that she not be forced to change in view of male officers, Lieutenant Tegtmeyer grabbed her by the shoulders and forced her up against the wall." (*Id.*, ¶ 61) Plaintiffs allege Collier grabbed Ayestas and slammed her to the floor, causing Ayestas "hit her face on the toilet when she fell." (*Id.*) Plaintiffs assert that once Ayestas was on the ground, Collier pinned her down with his knee, "Tegtmeyer held her legs," "Collier held her arms," and the two prison officials "proceeded to cut off Ayestas' clothing" with scissors retrieved by Trevino. (*Id.* at 11-12, ¶¶ 61-62)

The facts support there was no penological purpose served by directing Ayestas to change into a muumuu or by cutting off her clothes. It does not appear the force used by Tegtmeyer and Collier— including forcing her against the wall and slamming her to the ground in a manner that caused her to hit her face on the toilet—served any penological purpose.

It appears also that Trevino was an integral participant in the use of force, because he supplied the scissors used by Tegtmeyer and Collier knowing how they would be used. The Ninth Circuit observed that an individual may be held liable where he or she is an "integral participant" in unlawful actions, and "integral participation does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004) (internal quotation marks omitted) For example, in *Boyd* the court determined all officers involved in a search operation were integral participants where:

> [T]he officers in this case stood armed behind Ellison while he reached into the doorway and deployed the flash-bang. Second, the use of the flash-bang was part of the search operation in which every officer participated in some meaningful way. Third, every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed.

*Id.*, 374 F.3d at 780. Trevino was present during the use of force against Ayestas, knew of the plan to cut off her clothes, and provided the instruments used to do so—not objecting to the actions of the other officers. Accordingly, the Court finds the facts alleged state cognizable claims against Tegtmeyer, Collier, and Trevino.

On the other hand, the sole allegation regarding use of force by Reynolds against Ayestas is that is that Reynolds placed Ayestas in handcuffs. To the extent Plaintiffs seek to hold Reynolds liable as an integral participant, the facts do not support such a conclusion. The force used by Reynolds was not instrumental in gaining control over Ayestas who, it seems, complied with the command to get on the

ground when she exited the laundry room. As this Court previously observed, "[g]enerally, handcuffing an inmate involves some *de minimis* use of force." *Washington v. Hernandez*, 2017 U.S. Dist. LEXIS 207713, at *8 (E.D. Cal. Dec. 18, 2017). There are no facts alleged that the handcuffing was tighter than necessary or that Ayestas suffered any lingering injury from the force Reynolds used to cuff her.[1] Thus, the facts alleged do not support a claim of excessive force by Ayestas against Reynolds through the placement of handcuffs.

Finally, there are no facts alleged supporting a conclusion that Officer Herrera used any force against Ayestas, let alone excessive force in violation of the Eighth Amendment. Accordingly, the Court recommends the first cause of action—to the extent it is stated by Ayestas against Officers Reynolds and Hererra—be **DISMISSED**.

**B.**      **Second Claim for Relief: Sexual Abuse and Harassment**

In the Second Amended Complaint, Plaintiffs assert the claim for sexual abuse and harassment is stated "[b]y all plaintiffs against defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, and Officer Trevino, in their individual and official capacities." (Doc. 57 at 17) Plaintiffs allege the defendants "sexually abused and harassed plaintiffs, an act deeply offensive to human dignity and one that serves no legitimate penological purpose," and in doing "demonstrated malicious and sadistic intent to harm plaintiffs, causing plaintiffs harm in violation of their Eighth Amendment right[s]…." (*Id.* at 18, ¶ 114)

           1.      Sexual abuse and harassment under the Eighth Amendment[2]

A sexual assault on an inmate by a prison official implicates the rights protected by the Eighth Amendment. *Schwenk*, 204 F.3d at 1197; *see also Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) ("Sexual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm"). For this reason, severe or repetitive sexual abuse of an inmate by a prison

---

[1] Plaintiffs allege Ayestas' physical injuries came from the encounter with Lieutenant Tegtmeyer, Officer Collier, and Officer Trevino in the bathroom. In particular, Plaintiffs allege, "Ayestas had a black eye from her face hitting the toilet. She had bruises and injury to her back and shoulder from having a knee and the full weight of an officer pressed into her back and having her arm twisted as she was slammed into a wall. She still experiences chronic pain in her back and shoulder from the assault." (Doc. 57 at 13, ¶ 81)

[2] Previously, the Court observed Plaintiffs appeared to cast the factual allegations as supporting a claim based upon the right to privacy, citing instances in which they had "their sex organs… intentionally exposed to male guards and other prisoners." (Doc. 34 at 19) However, the "right to privacy" theory of liability is not present in the Second Amended Complaint, which focuses only upon harassment and abuse. Accordingly, the Court focuses its analysis on these claims.

officer can be "objectively, sufficiently serious" to constitute an Eighth Amendment violation. *Id.; see Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (noting the list of conditions held cruel and unusual by the Supreme Court is not exclusive). Sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and it is "simply not part of the penalty that criminal offenders pay for their offenses against society." *Boddie*, 105 F.3d at 861 (quoting, *Farmer*, 511 U.S. at 834).

On the other hand, the Eighth Amendment protections "do not necessarily extend to mere verbal sexual harassment." *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004); *Minifield v. Butikofer*, 298 F. Supp. 2d 900, 903-04 (N.D. Cal. 2004). Courts have determined repeatedly determined such conduct does not satisfy the "unnecessary and wanton infliction of pain" standard under the Eighth Amendment. *See, e.g.*, *Blueford v. Prunty*, 108 F.3d 251, 256 (9th Cir. 1997) (affirming summary adjudication in favor of the prison officials where "the only arguably sexually harassing conduct… was verbal"); *Morales v. Mackalm*, 278 F.3d 126, 132 (2d Cir. 2002) (allegations that prison guard asked prisoner to have sex with her and to masturbate in front of her and other female staffers did not rise to level of Eighth Amendment violation); *Barney v. Pulsipher*, 143 F.3d 1299, 1311 n. 11 (10th Cir. 1998) (allegations that a county jailer subjected female prisoners to severe verbal sexual harassment and intimidation was not sufficient to state a claim under the Eighth Amendment); *Zander v. McGinnis*, 1998 U.S. App. LEXIS 13533, 1998 WL 384625, at *2 (6th Cir. June 19, 1998) (finding a prisoner's claim that a guard called him "pet names" for ten months failed to support an Eighth Amendment claim "because allegations of verbal abuse do not rise to the level of a constitutional violation").

### 2.     Claim by Rojas

Plaintiffs alleges that "on a daily basis," unidentified guards used "degrading and sexually charged epithets," including calling Rojas "it" due to being "masculine-presenting." (Doc. 57 at 6, ¶ 22) According to Plaintiffs, "[o]fficers accused Rojas of not being a 'real man' and comment on their ability to sexually satisfy women," "make vulgar references to Rojas' genitalia and attempt to degrade and belittle Rojas with these references." (*Id.* at 15, ¶ 93) In addition, Plaintiffs allege that when Rojas was outside with Lara, Officers Trevino and Reynolds "verbally compared the sizes of their genitalia," which caused Rojas to fear sexual abuse. (*Id.* at 13, ¶73) These are the sole allegations addressing sexual abuse or harassment towards Rojas in the Second Amended Complaint.

Significantly, Plaintiffs fail to identify any *defendants* with their broad allegations that unidentified officers make degrading and vulgar comments to Rojas. Regardless, as discussed above, Eighth Amendment protections "do not necessarily extend to mere *verbal* sexual harassment." *Austin*, 367 F.3d at 1171 (emphasis added); *Minifield*, 298 F. Supp. 2d at 903-04 ("Allegations of verbal harassment and abuse fail to state a claim cognizable under 42 U.S.C. § 1983"). Because Rojas has alleged only verbal harassment by Officers Trevino and Reynolds—and has not linked Lieutenant Tegtmeyer, Collier, or Herrera to this claim—Rojas fails to state a claim for sexual harassment in violation of the Eighth Amendment.

Given Plaintiffs' failure to cure the factual deficiencies of Rojas' claim, the Court finds Rojas has implicitly admitted Rojas cannot do, so further leave to amend Rojas' claim would be futile. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (a party's failure to cure factual deficiencies on amendment is "a strong indication that the [party] has no additional facts to plead" and "that any attempt to amend would be futile"). Therefore, the Court recommends the second claim for relief, to the extent it is brought by Rojas, be **DISMISSED** without leave to amend.

### 3.     Claim by Lara

Plaintiffs allege, "Officers comment regularly on the sexual preferences of plaintiffs Lara and Ayestas, offering to sexually satisfying (sic) them like their 'girlfriends' cannot and threatening to use their power over plaintiffs to have sex with them." (Doc. 57 at 15, ¶ 15) In addition, Plaintiffs allege Lara was subjected to the same comments as Rojas by Trevino and Reynolds. (*See* Doc. 57 at 13, ¶ 73) Plaintiffs also assert Lara's breast was exposed on three occasions: (1) when Herrera applied pressure to Lara's back while she was on the ground, at which time it was stepped on by Collier; (2) when a strip search was performed by Guinn, in view of Herrera, and (3) when Lara's muumuu fell as she and Rojas were outside with Trevino and Reynolds. (*Id.* at ¶¶ 45, 48-49, 72)

#### a.     *Claim against Tegtmeyer*

As an initial matter, there are no facts alleged indicating that Lara interacted with defendant Tegtmeyer during the underlying incidents. Consequently, any claim by Lara for sexual abuse or harassment by Tegtmeyer fails. *See Gonzales v. Lamanuzzi,* 2019 WL 636853, at *4 (E.D. Cal. Feb. 14, 2019) ("Plaintiff's allegations must establish each named defendant's involvement in the alleged

deprivation, as there can be no liability under section 1983 unless there is some affirmative link or connection between a defendant's actions and the alleged constitutional violation") citing *Rizzo*, 423 U.S. at 371-72; *May v. Enomoto*, 633 F.2d 164, 167 (9th Cir. 1980).

### b.    Claim against Collier

In the Second Amended Complaint, Plaintiffs allege "Sergeant Collier intentionally stepped on [Lara's] exposed breast… [and] did not remove his foot or lessen his pressure" despite Lara's cries that he was on her breast.  (Doc. 57 at 9, ¶ 45)  There are no facts alleged that this act was of a sexual nature, such that a claim for abuse—separate from the claim for excessive force—is not supported.

Courts have determined isolated incidents of sexual touching—even when coupled with offensive sexual remarks—do not rise to the level of a constitutional violation. *See, e.g., Watison v. Carter*, 668 F.3d 1108, 1112-13 (9th Cir. 2012) (where an inmate asserted an officer entered his cell and approached the inmate while he was on the toilet, then rubbed the inmate's thigh, "began smiling in a sexual [manner], and left the cell laughing," the allegations were not sufficient to support a violation of the Eighth Amendment); *Jackson v. Madery*, 158 Fed.Appx. 656, 662 (6th Cir. 2005) (officer's conduct in allegedly rubbing and grabbing prisoner's buttocks in degrading manner was "isolated, brief, and not severe" and so failed to meet Eighth Amendment standards); *Berryhill v. Schriro*, 137 F.3d 1073, 1075 (8th Cir. 1998) (concluding two brief touches to the inmate's buttocks did not constitute as sexual assault in violation of the constitution); *Boddie*, 105 F.3d at 859-61 (finding a prisoner failed to state a violation of his constitutional rights where he asserted—on different occasions— a female corrections officer made a pass at him, touched him on several occasions, and called him a "sexy black devil").  Thus, incidents that cause "humiliation" may "not rise to the level of severe psychological pain required to state an Eighth Amendment claim." *Watison*, 688 F.3d at 1113.

Even assuming Collier targeted Lara's breast because it is a sexual organ, the Court is unable to find her claim rises to a constitutional violation.  Indeed, in *Boddie*, the facts before the Second Circuit were more egregious than those claimed by Lara.  In *Boddie*, the plaintiff, a male prisoner, alleged that a female prison guard squeezed his hand, touched his penis, and made sexually suggestive comments." *Id.* at 859-60.  On another occasion, the guard told the inmate to take off his sweatshirt, and she twice pinned the inmate to a door with her body. *Id.* The court concluded that "no single

incident that he described was severe enough to be 'objectively, sufficiently serious.' Nor were the incidents cumulatively egregious in the harm they inflicted." *Id.* at 861. The court found these incidents did "not involve a harm of federal constitutional proportions." *Id.* Likewise, here, the Court is unable to find harm of constitutional proportions by Collier against Lara, to the extent Plaintiffs cast the incident as sexual abuse.

### c.  Claim against Herrera, Trevino, and Reynolds [3]

Importantly, "the Supreme Court has not recognized that an interest in shielding one's naked body from public view should be protected under the rubric of the right of privacy . . . ." *See Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir. 1985). Although the Ninth Circuit determined "a prisoner[] [has] limited right to bodily privacy," such a claim "calls for a highly factual inquiry." *See Hydrick v. Hunter*, 500 F.3d 978, 1000 (9th Cir. 2007); *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988). Factors the Court has considered include: "the gender of those prison officials who viewed inmates, the angle and duration of viewing, and the steps the prison had taken to minimize invasions of privacy." *Id.*, citing *Grummett*, 779 F.2d at 494-95.

For example, in *Grummett*, the Court considered a claim by male inmates that their right to privacy was violated by female officers viewing them while dressing, showering, being strip searched, or using the toilet. *Id.*, 779 F.2d at 492. The Ninth Circuit assumed "the interest in not being viewed naked by members of the opposite sex is protected by the right of privacy." *Id.*, 779 F.2d at 494. The Court discussed the circumstances in which female officers were observing male inmates, noting:

> Female guards are not assigned to positions requiring unrestricted and frequent surveillance. Rather, the positions to which they are assigned require infrequent and casual observation, or observation at a distance. Female guards working the tiers walk past the cells routinely, but do not stop for prolonged inspection. When they are not walking down the tiers, their view of the inmates in their cells is circumscribed  by the cell bars and by the distance and angle of their stations. Likewise, the observations by the female correctional officers stationed on the gunrails overlooking the tiers and the yard areas are obscured by the angle and distance of their locations. Female guards do not accompany male inmates to the individual or gang showers, and are not stationed on the tiers where the showers are located. Females are assigned to the more distant gunrail position overlooking showers, where, again, the surveillance is obscured.

*Id.* at 494-95. The Ninth Circuit concluded that these circumstances were not "so degrading as to

---

[3] Notably, a right to privacy claim is *not* present in the Second Amended Complaint. Nevertheless, the Court addresses the standards governing such claims because Lara's claims concern exposure.

require intervention by [the] court," and there was no constitutional violation. *Id.* at 495. Likewise, the Court found there was no constitutional violation because the female guards' viewing of unclothed inmates was "infrequent and irregular," and the guards were not "stationed at those positions which involve close and prolonged surveillance of disrobed inmates." *Id.*

In *Michenfelder v. Sumner*, 860 F.2d 328 (1988), the Ninth Circuit also addressed a claim of a male inmate challenging the stationing of female officers on shower duty and involvement in strip searches as a violation of his right to privacy. *Id.* at 333-34. The Court indicated "the issue … is whether [the prison's] female officers regularly or frequently observe unclothed inmates without a legitimate reason for doing so." *Id.* at 334. The Ninth Circuit found that a division of responsibilities between male and female guards was a reasonable attempt to accommodate the tension between inmates' privacy concerns and the prison's internal security needs and equal employment concerns. *Id.* In addition, the Court found the right to privacy was not violated due to the limited nature of the guards' involvement in the searches, because the evidence showed observations were made from video monitors that provided "an indistinct, limited view." *Id.* The Court found "[e]vidence of female officers' role in shower duty likewise did not establish an inappropriate amount of contact with disrobed prisoners." *Id.* Accordingly, the Court concluded Michenfelder failed to establish violations of his Fourth and Eighth Amendment rights. *Id.* at 338.

Further, in *Somers v. Thurman*, 109 F.3d 614 (9th Cir. 1997), the Ninth Circuit considered a male inmate's claim that his constitutional rights under the Fourth Amendment were violated by female officers conducting visual body cavity searches on a regular basis and watching him shower. *Id.* at 616. Somers also asserted the prison officials "'pointed at him' and 'joked among themselves' during the searches and during his showers, behavior he characterize[d] as 'gawking.'" *Id.* Evaluating whether to apply the doctrine of qualified immunity, the Court reviewed its decisions in *Grummett, Michenfelder,* and *Sepulveda. See Somers*, 109 F.3d at 619-20. The Court observed it never "held that guards of the opposite sex are forbidden from viewing showering inmates." *Id.* at 620. The Court continued: "Taken together, however, one might read *Grummett, Michenfelder*, and *Sepulveda* to suggest that up close, frequent, and intentional viewings by guards of the opposite sex could violate a prisoner's privacy rights." *Id.* The Court found it significant that the actions alleged by Somers "did

not involve any physical conduct," and concluded "gawking, pointing, and joking" did not violate the Eighth Amendment. *Id.* at 624.

With these cases in mind, the facts alleged to support a claim by Lara are insufficient to support a claim for sexual abuse or harassment in violation of constitutional standards. Though Plaintiffs previously asserted that Lara's "sex organs were intentionally exposed to male guards and other prisoners" (Doc. 34 at 19), the facts alleged regarding the exposure have remained unchanged and do not support a conclusion that the exposure was intentional by any of the *defendants*. Instead, it appears the first exposure was caused by Herrera when he "slammed.... Lara on the ground" to place her in handcuffs, and later due to the muumuu being too large, which was provided by Officer Guinn, who is not a defendant. (*See* Doc. 57, ¶¶ 51-52, 72) Though Officer Guinn strip-searched Lara within the view of Officer Herrera, this single search is not sufficient to support a claim under the Eighth Amendment. *See Michenfelder*, 860 F.2d at 333-34 (finding a male inmate failed to state a claim where he challenged female officers' duty and involvement in strip searches as a violation of his right to privacy); *Grummett*, 779 F.2d at 495 ("infrequent and irregular" viewing of prisoners of the opposite sex by guards was not sufficient to support a claim).

For example, in *Morris v. Newland*, this Court considered the claim of an inmate plaintiff that officers violated his constitutional rights because female guards "made sure to observe plaintiff at length in the shower and in his cell." *Id.*, 2007 WL 707525 at *1 (E.D. Cal. Mar. 6, 2007). The defendants moved to dismiss, asserting the plaintiff failed to state a claim. *Id.* at *2. The Court noted Ninth Circuit authority "implicate[d] circumstances more severe than those set forth… with respect to plaintiff's cross-gender viewing claims." *Id.* at *4. For example, the Court noted that in *Somers*, the Ninth Circuit found a plaintiff failed to state a constitutional violation "even where the female officials had engaged in 'gawking' at the plaintiff and had pointed at him in the shower 'and joked among themselves.'" *Id.*, citing *Somers*, 109 F.3d at 622. In light of this, the Court found "the[] intentional observation of [the plaintiff] in the shower and in his housing unit in various states of undress" failed to rise to the level of a violation of the Fourth and Eighth Amendments. *Id.* at *5, *adopted by* 2007 WL 987846 (E.D. Cal. Mar. 30, 2007). Likewise, here, it appears that Lara believes officers intentionally viewed her in a state of undress. Nevertheless, as this Court determined in *Morris*, the circumstances

do not rise to an unconstitutional level.

### d.    Conclusion

Plaintiffs fail to link any of the defendants to the comments made by unidentified officers toward Lara regarding her sexual orientation or comments that she believed were threatening.  (*See* Doc. 57 at 15, ¶ 94)  Further, as discussed above, verbal sexual harassment of this sort fails to support a claim for a violation of the Eighth Amendment.  *Austin*, 367 F.3d at 1171; *Minifield*, 298 F. Supp. 2d at 903-04.

Given Plaintiffs' failure to cure the factual deficiencies of Lara's claim—despite Plaintiffs' awareness of the applicable legal standards and deficiencies of the prior pleading— the Court finds further leave to amend the second cause of action by Lara would be futile.  *See Zucco Partners,* 552 F.3d at 1007; *see also Simon v. Value Behavioral Health, Inc*., 208 F.3d 1073, 1084 (9th Cir. 2000) (affirming dismissal without leave to amend where the plaintiff failed to correct deficiencies in complaint, where the court had afforded opportunities to do so and had discussed with plaintiff the substantive problems with his claims).  Therefore, the Court recommends the second claim for relief, to the extent it is brought by Lara, be **DISMISSED** without leave to amend.

### 4.    Claim by Ayestas

In the Second Amended Complaint, Plaintiffs again do not identify any instances of sexual abuse or harassment by the defendants that was directed toward Ayestas, although she too brings a claim under the second cause of action. (*See* Doc. 57 at 17-18)  The Court cannot speculate as to the unconstitutional conduct, because Ayestas has a burden to identify a specific injury and show a causal relationship between the defendants' conduct and that injury.  *See Rizzo*, 423 U.S. at 371-72.

Given the lack of factual allegations to support a claim by Ayestas, the Court recommends the third cause of action, to the extent it is raised by Ayestas, be **DISMISSED** without leave to amend.

### C.    Third Claim for Relief: Retaliation

The claim for retaliation in violation of the First Amendment is brought "[b]y all  plaintiffs against defendants Lieutenant Tegtmeyer, Sergeant Collier, Officer Herrera, Officer Reynolds, [and] Officer Trevino in their individual and official capacities."  (Doc. 57 at 18) According to Plaintiffs, the

defendants[4], "motivated by plaintiffs' protected activity, retaliated against plaintiffs who were engaged in an effort to access the courts, an act protected under the First Amendment, by assaulting plaintiffs and restricting their access to grievances, thus chilling the plaintiffs' protected speech." (*Id.*, ¶116)

### 1. First Amendment legal standards

Under the First Amendment, prison officials may not retaliate against prisoners for initiating litigation or filing administrative grievances. *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005). A cognizable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) the inmate's protected conduct and that the adverse action (4) chilled the inmate's exercise of his First Amendment rights and (5) did not reasonably advance a legitimate penological purpose. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) (quoting *Rhodes*, 408 F.3d at 567-68).

A "plaintiff must plead facts which suggest that retaliation for the exercise of protected conduct was the 'substantial' or 'motivating' factor behind the defendant's conduct." *Harpool v. Beyer*, Case No. 2012 WL 4038444 at *11 (E.D. Cal. 2012), referring to *Soranno's Gasco, Inc., v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989). In addition, an adverse action is one that "would chill or silence a person of ordinary firmness from future First Amendment activities." *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (quoting *Mendocino Envtl. Center v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999)).

### 2. Claim by Rojas

Acknowledging that "neither the Ninth Circuit nor the Supreme Court has decided whether a prisoner's verbal complaints constitute protected activity," Judge Drozd has found "Rojas's verbal expression of an intent to report harassment to the ISU is sufficient to constitute engagement in protected activity." (Doc. 53 at 3-4)

Plaintiffs assert, "Sergeant Collier oversaw the [cell search] and made comments to Rojas and Lara that led them to believe that officers were searching for the evidence of officer misconduct to which that Rojas had alluded several days earlier." (Doc. 57 at 7-8, ¶ 30) As the cell was searched,

---

[4] The Second Amended Complaint retains allegations that Officers Dalie, Sergeant Rubalcava, Officer Valencia, and Officer Tel Toro violated the plaintiffs' rights. (Doc. 57 at 18, ¶ 116) However, these individuals are no longer named as defendants in the amended pleading.

Rojas again asked Collier to speak to ISU, and Plaintiffs contend "[i]n response, Sergeant Collier began shoving Rojas around." (*Id.* at 8, ¶¶ 31-33)  In addition, Plaintiffs contend the boot burn by Collier was in retaliation for the complaints, and "for no other reason than to unjustifiably punish and cause pain to Rojas." (*Id.*, ¶ 37)

Plaintiffs do not allege facts supporting a conclusion that defendants other than Herrera and Collier were aware of Rojas' requests to speak to ISU, which were directed to Hererra and Collier prior to and during the cell search.  As such, Plaintiffs fail to allege facts supporting the requisite intent to take adverse action *because of* the Rojas' protected conduct.  *See Brodheim*, 584 F.3d at 1269.  Thus, the Court finds Rojas fails to state a claim against Lieutenant Tegtmeyer, Officer Reynolds and Officer Trevino for retaliation, and recommends Rojas' claim against these defendants be **DISMISSED**.

### 3.    Claim by Lara

Plaintiffs allege that Lara made a verbal request for a grievance form from Collier.  (Doc. 57 at 9, ¶ 41)  As noted above, Judge Drozd concluded such statements constitute protected conduct under the First Amendment.  Given this, the facts, as alleged, support a conclusion that Collier used force against Lara due to her repeated requests for a grievance form, and not for any penological purpose.  Thus, Lara states a cognizable claim for retaliation against Collier.

On the other hand, Lara does not identify any actions she took that motivated the remaining defendants in their actions or allege facts demonstrating the remaining defendants had knowledge of any protected activity by Lara.  Consequently, Lara fails to state a claim for retaliation against Lieutenant Tegtmeyer and Officers Herrera, Reynolds, and Trevino, and the Court recommends Lara's claim against these defendants be **DISMISSED**.

### 4.    Claim by Ayestas

Ayestas does not identify any actions she took that would be protected by the First Amendment that motivated Defendants.[5]   Thus, she fails to state a claim for retaliation in violation of the First Amendment. *See Brodheim*, 584 F.3d at 1269.  Accordingly, the Court recommends the third claim for relief, to the extent it is brought by Ayestas, be **DISMISSED**.

---

[5] Plaintiffs allege that *after* the actions that form the basis for this complaint, Ayestas requested grievance forms "were continually denied access to the forms." (Doc. 24, ¶¶ 90-91)  It is not clear who denied the forms. Regardless, the form requests by Ayestas clearly could not have motivated the actions already taken by Defendants.

## G. Fourth Claim for Relief: Failure to Adequately Hire, Train, Supervise, and Discipline Correction Officers

The final claim for relief is brought "[b]y all plaintiffs against defendants Diaz and Espinoza in their official capacities."  (Doc. 57 at 18)  According to Plaintiffs,

> [D]efendants Diaz and Espinoza failed in their obligation to adequately train their corrections officers to refrain from subjecting prisoners to excessive force and sexual abuse and harassment, violations of plaintiffs' constitutional rights, in their obligation to have in place policies that protect the constitutional and statutory rights of prisoner[s], and in their obligation to discipline officers who violate the constitutional and statutory rights of prisoners.

(*Id.* 18-19, ¶ 119) Plaintiffs contend that due to these actions—or inaction— "defendants Diaz and Espinoza are deliberately indifferent to the obvious consequences of their failure to adequately hire, train, supervise, and discipline corrections officers who engage in these constitutional violations."  (*Id.* at 19, ¶ 120) (emphasis omitted)

### 1. Supervisor liability under Section 1983

Under Section 1983, Plaintiffs must demonstrate that each defendant *personally* participated in the deprivation of their rights. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir.2002) (emphasis added). Thus, liability may not be imposed on supervisory personnel under Section 1983 on the theory of *respondeat superior*, as each defendant is only liable for his or her own misconduct. *Iqbal*, 129 S.Ct. at 1948-49(2010); *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009). A supervisor may be held liable only if he or she "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); accord *Starr v. Baca*, 633 F.3d 1191 (9th Cir. 2011); *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009); *Preschooler II v. Clark County School Board of Trustees*, 479 F.3d 1175, 1182 (9th Cir. 2007); *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997).

A supervisor's failure to train subordinates may give rise to individual liability under Section 1983 where the failure amounts to deliberate indifference to the rights of persons with whom the subordinates are likely to come into contact. *See Canell v. Lightner*, 143 F.3d 1210, 1213-14 (9th Cir. 1998). To impose liability under this theory, a plaintiff must demonstrate the subordinate's training was inadequate, the inadequate training was a deliberate choice on the part of the supervisor, and the

inadequate training caused a constitutional violation. *Id.* at 1214; *see also City of Canton v. Harris*, 489 U.S. 378, 391 (1989); *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).

2. Analysis

In a case based on an ongoing violation of federal constitutional or statutory rights, a plaintiff may obtain prospective injunctive relief by naming a state official in his or her official capacity. *Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997) ("When sued for prospective injunctive relief, a state official in his official capacity is considered a 'person' for § 1983 purposes.").

Plaintiffs seek to state claims against Ralph Diaz, the Secretary of California Department of Corrections and Rehabilitation, and Janel Espinoza, Warden at CCWF, in their official capacities. (*See* Doc. 57 at 5, ¶¶ 13-14) According to Plaintiffs, "Diaz is responsible for ensuring that the CDCR complies with all state and federal laws, and that the civil and legal rights of individuals confined by CDCR are upheld." (*Id.*, ¶ 14) In addition, Plaintiffs assert that "Espinoza is responsible for ensuring that CCWF complies with all state and federal laws, and that the civil and legal rights of individuals confined at CCWF are upheld." (*Id.*, ¶ 15)

Plaintiffs assert that Diaz and Espinoza "required to train corrections officers and implement policies that protect the constitutional and statutory rights of prisoners, and discipline officers who violate such rights." (Doc. 57 at 18, ¶ 118) They assert the defendants failed to train their corrections officers, "to have in place policies that protect the constitutional rights of prisoner," to discipline officers who violated prisoners' rights. (*Id.* at, ¶ 119)

Significantly, there are no facts alleged supporting assertion that Diaz—as the Secretary of CDCR—has an obligation to *train* the officers that work at CDCR's institutions such as CCWF. Indeed, such a claim seems dubious. Further, Plaintiffs' claims against Kernan and Espinoza again fail because they have not identified a state policy or procedure at issue to state an official capacity suit for injunctive relief against Secretary Kernan or Warden Espinoza. *See Haber v. Melo*, 502 U.S. 21, 25 (1991)).

Significantly, the Court identified the same pleading deficiencies in dismissing the claim against the Secretary of the CDCR and the Warden with the First Amended Complaint. (*See* Doc. 38 at 39)

Despite this, Plaintiffs have not alleged additional facts to support their claims, and again failed to identify the injunctive relief sought in the Second Amended Complaint, such that the Court can determine prospective injunctive relief is a viable and available remedy. Consequently, the Court recommends the claims against Diaz[6] and Espinoza be **DISMISSED** without leave to amend. *See Zucco Partners,* 552 F.3d at 1007 (failure to cure deficiencies on amendment is "a strong indication that the [party] has no additional facts to plead" and "that any attempt to amend would be futile"); *Simon*, 208 F.3d at 1084.

### E.     Dismissal of other Defendants

Because the claims of Rojas, Lara, and Ayestas were severed from those of Medina, Plaintiffs do not state claims against Abdel Dalie, Gilbert Rubalcava, Officer Valencia, and Officer Del Toro in the Second Amended Complaint. In addition, it appears Plaintiffs have abandoned claims against Darral Adams and Deborah Johnson. Accordingly, the Court recommends these individuals be terminated as defendants in this action.

## V.     Findings and Recommendations

Based upon the foregoing, the Court finds Plaintiffs failed to allege sufficient *facts*—rather than legal conclusions—to support several claims raised in the Second Amended Complaint. Thus, the Court **RECOMMENDS**:

1.     The First Claim for Relief, for excessive force in violation of the Eighth Amendment, be **DISMISSED** without leave to amend to the extent it is brought by:

    a.     Rojas against Lieutenant Tegtmeyer and Officers Herrera, Reynolds, and Trevino;

    b.     Lara against Lieutenant Tegtmeyer and Officers Reynolds and Trevino; and

    c.     Ayestas against Officers Reynolds and Trevino;

2.     The Second Claim for Relief be **DISMISSED** without leave to amend;

3.     The Third Claim for Relief, for retaliation in violation of the First Amendment, be

---

[6] The facts alleged fail to demonstrate Diaz has control over the customs in place at individual prisons. Rather, the plaintiffs seem to assert that it is the wardens that have this control. Thus, it appears that Diaz is named purely because he is "where the buck stops" for the CDCR as a whole.

25

**DISMISSED** with leave to amend to the extent it is brought by:

    a.    Rojas against Lieutenant Tegtmeyer, Officer Reynolds, and Officer Trevino; and

    b.    Lara against Lieutenant Tegtmeyer, Officer Reynolds, and Officer Trevino.

4.    The Third Claim for relief for retaliation as raised by Ayestas be **DISMISSED** without leave to amend;

5.    The Fourth Claim for relief be **DISMISSED** without leave to amend;

6.    Defendants Ralph Diaz and Janel Espinoza be **DISMISSED**; and

7.    Abdel Dalie, Gilbert Rubalcava, Officer Valencia, and Officer Del Toro, Darral Adams, and Debora Johnson be **TERMINATED** as defendants.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within fourteen days after being served with these Findings and Recommendations, any party may file written objections. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to objections shall be filed within seven days of the date of service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991); *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   __April 29, 2019__         _____**/s/ Jennifer L. Thurston**
                                          UNITED STATES MAGISTRATE JUDGE